ATTORNEYS FOR APPELLANT
John Andrew Goodridge
Evansville, Indiana

William Wayne Gooden
Mt. Vernon, Indiana

ATTORNEYS FOR AMICUS CURIAE
MARION COUNTY PUBLIC DEFENDER
AGENCY
Joel M. Schumm
Indianapolis, Indiana

Ann M. Sutton
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Stephen R. Creason
Deputy Attorney General
Indianapolis, Indiana



FILED

Dec 10 2009, 9:41 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 10S00-0808-DP-453

DANNY RAY WILKES,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Clark Circuit Court, No. 10C01-0705-MR-158
The Honorable Carl A. Heldt, Special Judge

On Direct Appeal

**December 10, 2009**

**Boehm, Justice.**

In this direct appeal, Daniel Wilkes appeals his murder convictions and death sentence.
We affirm Wilkes's murder convictions and death sentence.

**Facts and Procedural History**

In the spring of 2006, Daniel Wilkes met Donna Claspell and Michael Baker while all three were being treated at a drug rehabilitation center. After discharge, Wilkes stayed with Donna and her two daughters, eight-year-old Sydne Claspell and thirteen-year-old Avery Pike. Wilkes told Baker that one night he awoke to find Avery "hunching on his leg," and that he and Avery then engaged in mutual oral sex. Wilkes later admitted to molesting Avery on a total of three or four occasions. On the evening of April 23 or the early morning of April 24, Donna found Wilkes and Avery together and told Wilkes that he would have to leave the home.

Around eight o'clock the next morning, Donna's neighbors observed Baker picking up Wilkes at the home, and one heard Wilkes say something like, "I've got to get out of here." That night, according to Baker, Wilkes kept looking out the windows and expressed concern that the police would come for him.

On April 26, the bodies of Donna, Sydne, and Avery were found in their home. Donna and Sydne were in the master bedroom. Donna had sustained multiple injuries, including a deep cut wound to the neck and blows to the head from a hammer and another blunt instrument. A knife was found under Donna's shoulder. Sydne had died from at least twenty-seven blows to the head, back, and shoulders from a hammer head and claw. Avery was found in her bedroom naked and face down on the bed. Her hands were bound behind her back with a cord, her ankle was tied to the bedpost, and she had been strangled with a piece of clothing.

DNA and serological tests were performed on several items from Donna's home and also on clothing Wilkes was wearing at the time of his arrest. Donna's blood was found on the ball and claw of a hammer and on a level found at the home, and also on a shirt and hat worn by Wilkes. Sydne's blood was found on the claw of the hammer and on Wilkes's shirt and her DNA was found on Wilkes's shoe. Wilkes confessed to the murders under circumstances described below.

Wilkes was charged with all three murders. The State filed a death penalty request alleging as a statutory aggravating circumstance of each murder that Wilkes had committed multiple murders and, as to Sydne, that the victim was less than twelve years old.

2

The jury found Wilkes guilty of all three murders. In the penalty phase, the jury found all four aggravating circumstances and found that the aggravating circumstances outweighed the mitigating circumstances, but could not agree on a sentencing recommendation. After discharging the jury, the trial court conducted the sentencing. The court accepted the jury's findings and independently found the aggravating circumstances and that the aggravating circumstances outweighed the mitigating circumstances. For each murder, the trial court sentenced Wilkes to death.

In this direct appeal, Wilkes challenges his convictions and his sentence, arguing that:

I.     The trial court erred in admitting transcripts and recordings of four interviews in which he acknowledged his guilt;

II.    The trial court erred in admitting evidence of his molesting of Avery, expert testimony regarding a presumptive test for blood, and opinion testimony on guilt;

III.   Indiana's death penalty statute violates the Indiana Constitution's requirement of separation of powers and the Federal Sixth Amendment; and

IV.    Wilkes was not sentenced properly.

## I. Admissibility of Wilkes's Interviews

At trial, over Wilkes's objection, the State introduced transcripts of four interviews in which Wilkes acknowledged his guilt. A videotape of the first interview and audio recordings of the other three were also admitted. Wilkes argues that the trial court erred in admitting these because the interviews were given involuntarily in violation of his right to remain silent.

Unlike the Federal Constitution, Indiana law imposes on the State the burden of proving beyond a reasonable doubt that a confession is voluntary. Lego v. Twomey, 404 U.S. 477, 488–89 (1972); Pruitt v. State, 834 N.E.2d 90, 114–15 (Ind. 2005) (plurality); Miller v. State, 770 N.E.2d 763, 767 (Ind. 2002); Owens v. State, 427 N.E.2d 880, 884 (Ind. 1981). In evaluating a claim that a statement was not given voluntarily, the trial court is to consider the "totality of the circumstances," including any element of police coercion; the length, location, and continuity of the interrogation; and the maturity, education, physical condition, and mental health of the defendant. Miller, 770 N.E.2d at 767. To determine that a statement was given voluntarily, the court must conclude that inducement, threats, violence, or other improper influences did not overcome the defendant's free will. Clark v. State, 808 N.E.2d 1183, 1191 (Ind. 2004).

3

On appeal, the trial court's determination of voluntariness is reviewed as other sufficiency matters. Id. We do not reweigh the evidence, and we affirm the trial court's finding if it is supported by substantial evidence. Miller, 770 N.E.2d at 767.

A. *April 26 Interview*

Wilkes's first interview by police took place on April 26 from approximately 6:00 to 11:00 p.m. and was videotaped. Before making any statements, Wilkes was advised of his Miranda rights and signed a written waiver. Wilkes was provided dinner and cigarettes at a half-hour break around 9:30 p.m. In the course of the interrogation, Wilkes admitted to killing Donna, Avery, and Sydne. Wilkes claims that any statements in the April 26 interview were involuntary because of the convergence of the following factors: (1) he was under the influence of drugs during the interview; (2) police used a psychologically coercive interrogation method; (3) the statements in his interview contained inconsistencies; (4) police promised Wilkes a cigarette in exchange for information; and (5) Wilkes attempted to end the interrogation before admitting to the crimes.

1. *Influence of drugs.* At five points in the April 26 interrogation Wilkes claimed to be under the influence of drugs. Statements are inadmissible due to intoxication only when an accused is intoxicated to the point that he is unaware of what he is saying. Pruitt, 834 N.E.2d at 115 (plurality opinion) (citing Williams v. State, 489 N.E.2d 53, 56 (Ind. 1986)). Intoxication to a lesser degree goes only to the weight to be given the statement. Id. Here, Wilkes does not claim that his intoxication caused him to be unaware of his statements during the interview, and the detectives who interrogated him testified that he did not appear intoxicated. The trial court's ruling that Wilkes's interview was not involuntary due to his intoxication is supported by sufficient evidence.

2. *Psychologically coercive interrogation methods.* Wilkes argues that the April 26 interrogation was coercive because the detective insisted that Wilkes remembered the crimes and supplied him with details even though Wilkes repeatedly denied remembering the crimes. Wilkes argues that his confession was involuntary because he merely repeated back to the detective facts he learned during the interrogation.

4

Certainly a confession in which the defendant parrots detective-fed details of the crime may be less reliable than one in which the defendant freely volunteers his story in its entirety. But under Wilkes's circumstances, the trial court had sufficient evidence to find that Wilkes was not psychologically coerced. Because the exchange was videotaped, the trial court was in a position to evaluate demeanor.[1] The interrogation lasted five hours, and Wilkes was provided with three cigarettes and a break for food. It is true that the detective provided Wilkes with many details of the crimes, but Wilkes also described details of the crimes that were not provided by the detective. For example, he stated that he had a flash of Donna lying on her bed in a lot of blood before the detective told him that Donna was found on her bed. Moreover, in the interviews Wilkes identified instances when he was referring to police suggestions rather than his own memory. Wilkes cites no authority for his contention that supplying some facts to a defendant renders the defendant's statement involuntary. This Court has previously held that various interrogation techniques—"good cop, bad cop," providing a morally acceptable answer, blaming the victim, and bargaining—do not necessarily create an involuntary statement. Pierce v. State, 761 N.E.2d 821, 824 (Ind. 2002). Given all of these considerations, the trial court's conclusion that the interrogation method did not render Wilkes's interview involuntary is supported by more than sufficient evidence.

3. *Inconsistent statements*. Wilkes cites to inconsistencies in his April 26 interview as evidence that his statements were not voluntarily given.[2] Inconsistencies are a factor to be considered in determining whether a statement is voluntary. Light v. State, 547 N.E.2d 1073, 1077 (Ind. 1989). But inconsistencies can also be the product of untruthfulness or evasiveness, and are not in themselves a strong indication of lack of voluntariness. The trial court had the opportunity to view the videotape of the interrogation and make a determination as to whether Wilkes's will had been overcome. Again, given the circumstances of this interrogation the trial

---

[1] The videotape of the April 26 interview was admitted in evidence but was not included in the appellate record.

[2] For example, on page 40 of the interrogation transcript, Wilkes said, "I did it." On page 44, he said he did not know whether Michael Baker did it. On page 45, he said he did it and then claimed, "I don't remember doing it." On page 52, when asked who killed Donna, he responded, "Me, I guess." Then he said, "I don't think I killed her." On page 53, he said, "I killed her I guess." Later he suggested that Baker killed Donna.

5

court had sufficient evidence to find that Wilkes's responses were voluntary and that the jury could consider the inconsistencies in determining whether to give the interview credit.

4. *Promise of a cigarette.* Wilkes requested cigarettes several times during the April 26 interrogation. Late in the interrogation, after Wilkes had already made incriminating statements, he again asked for a cigarette. The following exchange occurred:

WILKES: I need another cigarette, please. And we'll talk.

***

DETECTIVE: Are you going to tell me the truth if I get you a cigarette?

A: Yeah.

Q: Flat out bottom, no more lying. Will you do that?

A: Yes.

Q: Now, all I got to do is give you one more cigarette?

A: Two.

Q: I'll give you one. You tell me, then I'll give you another one. But I want you to tell me the truth.

A: Ok.

Wilkes was provided with a cigarette, and the interrogation continued on to topics such as Wilkes's job history, his daughter, and his experience with methamphetamine before returning to the murders. Roughly seven minutes after receiving the cigarette,[3] when asked "what happened that night," Wilkes said, "I did it . . . I just remember hitting." Later, Wilkes was offered food and another cigarette.

The offer of a cigarette specifically in exchange for information could be viewed as an inducement leading to an involuntary confession. However, given the lapse in time between the cigarette and this admission and that Wilkes had already admitted to having flashes of Donna in a bloody bed and of Avery facedown and bound in her bed, the trial court had sufficient evidence to conclude that Wilkes's will was not overcome by the promise of a cigarette. See <u>Anderson v.</u>

---

[3] Without the interview videotape, we cannot determine exactly how much time passed between the offer of a cigarette and the incriminating statements. Based on the transcript's length of 140 pages and the total interview time of 4 hours and 12 minutes, each page covered an average of 1½ to 2 minutes. The incriminating statements were made 5 pages after receiving the cigarette and 8 pages after the detective's offer.

Terhune, 467 F.3d 1208, 1213 (9th Cir. 2006) (statement not involuntary when detectives withheld cigarettes until defendant agreed to talk) (rev'd en banc on other grounds, 516 F.3d 781 (9th Cir. 2008)).

5. *Wilkes's attempt to end the interrogation.* Finally, Wilkes argues that his April 26 interview was involuntary because he attempted to end it several times before making admissions. Wilkes points to the following phrases as attempts to end the interrogation: "Well, I have, I'm still high and you're going to go away," "No I can end this today with me, and I don't have to know shit," and "I don't want to talk about it no more. I don't want to think about it. Cause right now I'm still high." After each statement, Wilkes continued conversing with the detective.[4]

An assertion of the Miranda right to remain silent must be clear and unequivocal. Clark, 808 N.E.2d at 1190. In determining whether a defendant has asserted this right, the statements are considered as a whole. Id. Mere expressions of reluctance to talk do not invoke the right to remain silent. Id. This Court has held several times that raising doubts or expressing concern about continuing followed by continued dialogue do not unambiguously assert the right to remain silent. Id.; Griffith v. State, 788 N.E.2d 835, 842 (Ind. 2003) ("I might as well not say anything more," followed by disclosure of information, did not invoke the right to remain silent); Haviland v. State, 677 N.E.2d 509, 514 (Ind. 1997) ("I'm through with this," followed by continued dialogue did not unambiguously assert the right to remain silent). Here, after each of Wilkes's purported attempts to end the interrogation, he continued to speak with the detective.

---

[4] For example, after the latter statement, the dialogue continued on:

> DETECTIVE: But, but don't you . . .
>
> WILKES: and I don't . . .
>
> Q: I understand that, but the truth is there.
>
> A: But I don't just don't want to know, that high and I really don't want to think about it.
>
> Q: Ok, don't you want to get it . . . You told me while ago you wanted to tell the truth, you wanted to get it off your . . .
>
> A: I think this time tomorrow morning, I'll be dead too.

The trial court's conclusions that Wilkes did not unequivocally assert his right to remain silent, and that his further statements were voluntary, were supported by sufficient evidence.

### B. *April 27 Interview*

Wilkes argues that statements made in the course of his April 27 interview are inadmissible because the interview was not preceded by a <u>Miranda</u> warning. The April 27 interview began at 2:35 a.m., less than four hours after the April 26 interview ended.

A similar claim was made by the defendant in <u>Ogle v. State</u>, 698 N.E.2d 1146 (Ind. 1998). In <u>Ogle</u>, the defendant signed a waiver of <u>Miranda</u> rights and was questioned. Questioning stopped for less than an hour, and then resumed without a second Mirandizing. We noted:

> Although it might be the better practice to reiterate such warnings after an interruption of questioning, a readvisement is only necessary when the interruption deprived the suspect of an opportunity to make an informed and intelligent assessment of his interests. If the interruption is part of a continual effort to investigate the suspect, then the suspect's interests remain fairly clear.

698 N.E.2d at 1149 (internal citations omitted); <u>cf.</u> 2 Wayne R. LaFave et al., <u>Criminal Procedure</u> § 6.8(b) (3d ed. 2007) ("It is generally accepted that fresh warnings are not required after the passage of just a few hours."). Although the break in <u>Ogle</u> was shorter than the break here, the interruption in Wilkes's interrogation was part of a continuing investigation, and Wilkes's interests remained clear. The trial court therefore did not err in admitting the April 27 interview at trial.

### C. *April 28 Media Interview*

After Wilkes was in custody, the media requested an interview. The police presented Wilkes with a standard media consent form, which he signed. The consent form did not advise Wilkes of his right to counsel or of his right to refuse the interview, although the line above Wilkes's signature stated: "INMATE MAY WAIVE ATTORNEY'S SIGNATURE BY SIGNING BELOW." The officer who provided the form to Wilkes testified that he did not know whether Wilkes had a lawyer. During the media interview, Wilkes confessed to the murders and to molesting Avery.

Wilkes argues that he should have been advised of his right to counsel before taking the media interview. Wilkes cites Standard 8-2.1 of Part II of the ABA Standards for Criminal Justice, which suggests that officers should not

> exercise their custodial authority over an accused individual in a manner that is likely to result in . . . the interviewing by representatives of the news media of a person in custody except on request or consent by that person to an interview after being informed adequately of the right to consult with counsel and the right to refuse to grant an interview.

Recently in <u>Ritchie v. State</u> this Court discussed whether <u>Miranda</u> warnings are required before media interviews. 875 N.E.2d 706, 717 (Ind. 2007). We concluded that <u>Miranda</u> warnings are required only to overcome the "inherently coercive and police-dominated atmosphere inherent to a custodial interrogation," and that "civilians conducting their own investigation need not give <u>Miranda</u> warnings." <u>Id.</u>; <u>see also</u> 2 LaFave, <u>supra</u>, § 6.10(b) ("[I]t is clear that <u>Miranda</u> does not govern interrogation by private citizens acting on their own. This covers . . . a newspaper reporter . . . ."). The ABA Standards have not been adopted in Indiana. Unless and until the ABA Standards have been adopted and apply prospectively, we reaffirm our holding in <u>Ritchie</u> and conclude that the trial court did not err in rejecting Wilkes's claim that the media interview must be excluded from evidence.

D. *April 28 Interview*

On April 28, approximately thirty-seven hours after his April 27 interview by police, Wilkes was questioned by police a third time. This interrogation was preceded by <u>Miranda</u> warnings. Wilkes argues that statements in this interview were inadmissible because "the State failed to prove it was free from the taint of the earlier statements." Because we find no taint in Wilkes's earlier interviews, we conclude that the trial court did not err in admitting the April 28 interview.

## II. Evidentiary Issues

Wilkes claims three errors in the admission of evidence at his trial. As to two of these, we do not agree that there was error, and as to the third we find that any error was harmless.

9

A. *Indiana Evidence Rule 404(b)*

Indiana Evidence Rule 404(b) prohibits evidence of other crimes, wrongs, or acts to "prove the character of a person in order to show action in conformity therewith." However, the Rule expressly allows such evidence for other purposes, including proof of motive. In this case, Wilkes confessed to sexual activity with thirteen-year-old Avery, and the State successfully sought to admit these confessions as evidence relevant to Wilkes's motive for the murders. Wilkes does not contend that this evidence is irrelevant to motive. Nor does he claim that the prejudicial effect of this evidence outweighs any probative value. Rather, he contends that the corpus delicti rule bars proof of his confession to child molesting.

In Indiana, a crime may not be proven based solely on a confession. Admission of a confession requires some independent evidence that a crime was committed. Workman v. State, 716 N.E.2d 445, 447 (Ind. 1999). Wilkes points out that there is no evidence other than his confession that the crime of child molesting was committed. Wilkes objected generally that his confessions to sexual activity with Avery were inadmissible as prior crimes or bad acts, but did not raise the corpus delicti point. Although the issue is not preserved for appeal, we choose to address it.

The corpus delicti rule does not apply to evidence of other crimes permitted by Evidence Rule 404(b). The purpose of the corpus delicti rule is to prevent conviction for a crime that did not occur. Sweeney v. State, 704 N.E.2d 86, 111 (Ind. 1998); 1 Wayne R. LaFave, Substantive Criminal Law § 1.4(b) (2d ed. 2003). That purpose does not apply to evidence of crimes offered under Rule 404(b) to establish motive or intent because there is no danger of conviction for those crimes. Moreover, the corpus delicti rule does not apply here because admission under Evidence Rule 404(b) does not require proof sufficient for conviction. Evidence of other wrongs or acts is admissible if it is relevant to establish motive, intent, identity, and the like, irrespective of whether there has been a conviction. Prior crimes offered under Rule 404(b) need not establish the crime beyond a reasonable doubt. See 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5249, at 535 (1978) (addressing the same issue under Federal Rule of Evidence 404(b)). The same reasoning applies to other rules of sufficiency of evidence,

including <u>corpus</u> <u>delicti</u>.  Accordingly, the trial court correctly admitted Wilkes's confessed molestation of Avery.

       B. *Indiana Evidence Rule 702(b)*

       Wilkes argues that it was error to admit phenolphthalein test results because the State did not lay a foundation explaining the test's reliability.  Indiana Evidence Rule 702(b) governs the admissibility of expert scientific testimony.  The Rule provides that expert scientific testimony is admissible only if "the court is satisfied that the scientific principles upon which the expert testimony rests are reliable."  Reliability of a test may be established by judicial notice or by a sufficient foundation to establish reliability.  <u>Malinski v. State</u>, 794 N.E.2d 1071, 1084 (Ind. 2003).  The trial court's decision to admit scientific testimony under Rule 702(b) is reviewed for abuse of discretion.  <u>Rondon v. State</u>, 711 N.E.2d 506, 516 (Ind. 1999).

       On the third day of a five-day guilt phase, the court held a hearing on Wilkes's motion in limine to preclude the State's witness from testifying that a stain from Wilkes's shoe on April 26, 2006 tested "presumptive" for blood using a phenolphthalein test.  At the hearing, the witness, who had been trained in the identification of body fluids and had testified as an expert sixty times, testified that she performed a phenolphthalein test that indicated the "possibility" of the presence of blood in the stain.  An additional test would be required to determine whether the substance was in fact blood.  The witness further testified that she had performed hundreds, perhaps thousands of phenolphthalein tests and that the "majority of the time," if a presumptive test was followed by a definitive test for blood, the latter confirmed the presence of blood.  Here, no additional test was performed to confirm that the stain on Wilkes's shoe was blood because the quantity was insufficient to do both a blood test and a DNA test.  The DNA test revealed that the stain was biological matter from Sydne.  After hearing this testimony, the trial court ruled that the uncertainty of the phenolphthalein test went to its weight, not its reliability, and allowed the witness to reprise this testimony at trial.

       When the expert did testify and presented her report that the stain tested "presumptive" for blood, Wilkes made no further objection.  The State argues that Wilkes's failure waived any error in permitting the expert to testify that the stain tested presumptive for blood.  The State is correct that a failed motion in limine to exclude evidence ordinarily does not eliminate the

11

requirement that a party must object at the time the evidence is offered at trial to preserve the issue for appeal. Brown v. State, 783 N.E.2d 1121, 1125 (Ind. 2003). But this rule arises from cases where motions in limine, as is usually the case, were made before trial. The rule is derived from a desire to give the trial court the opportunity to reconsider the ruling in light of subsequent developments at trial. See id. Here the trial court's ruling on the motion was made after a mid-trial hearing and the witness testified immediately after the hearing, so the issues were fully developed and fresh in the trial court's mind. Under these circumstances we find the issue preserved for appeal.

Although the issue is preserved, we find it without merit. First, by far the most damaging part of this testimony was that Sydne's DNA was found in the stain. Whether it was from blood or another source, Sydne died from over twenty blows that left not only her blood but also other tissue on a weapon found at this horrific scene. Second, and equally important, to the extent there was any significance to whether the stain was blood rather than some other biological material bearing Sydne's DNA, the State's witness explained that the test was only presumptive and required confirmation to establish conclusively that the stain was in fact blood. She also explained that a presumptive test made it more probable than not that a definitive test would confirm the presence of blood. The test was therefore admissible evidence, if not conclusive, on this point.

C. *Evidence Rule 704(b)*

Indiana Evidence Rule 704(b) prohibits witnesses from giving opinions concerning guilt in a criminal case. Wilkes argues that a statement made by the detective during the April 26 interrogation was an opinion of Wilkes's guilt and should have been excluded.

Before trial, Wilkes requested that the court redact from the transcript "any statements made by the police that implicitly or explicitly convey the officer's opinions concerning Wilkes's intent, guilt or innocence . . . ." The trial court denied this motion. Wilkes renewed his objection at trial, and it was overruled. At trial, a transcript of the April 26 interrogation was admitted as an exhibit. The transcript contained the following conversation:

DETECTIVE BROWN: Mmm-hmm. Alright, am I bringing up any . . .
WILKES: No

Q: Memories. for Danny, Danny

A: I'm freaking out.

Q: Danny look at me buddy. Danny . . . any cords used to hold somebody down?

A: Yeah . . .

Q: Get mad. Put something around their throats . . . this is what happened didn't it. Danny, it happened . . .

A: I believe it happened.

Q: It happened. And you were there, you were there and we know it, and you know it, or we wouldn't be up here.

Wilkes argues that Detective Brown expressed his opinion of Wilkes's guilt when he stated, "It happened. And you were there, you were there and we know it, and you know it, or we wouldn't be up here."

In <u>Smith v. State</u>, 721 N.E.2d 213, 217 (Ind. 1999), we held that admission of an officer's statement "I thought it was you" was error under Rule 704(b). We also found that the Rule prohibited admission of the following statement by an interrogating detective: "Something stinks. So basically all we've got is your word that Boogie shot this guy. Is that what you're telling us . . . I think you was looking out for Boogie." <u>Lampkins v. State</u>, 778 N.E.2d 1248, 1251 (Ind. 2002). The detective's statement here is similarly problematic under Rule 704(b), and the trial court erred in admitting it. However, admission of the detective's statement in this case—one line in an over one-hundred-page interview transcript and several days of evidence—was relevant only to guilt, not the penalty, and was harmless in view of the forensic evidence and confessions supporting Wilkes's guilt.

### III. Constitutionality of Indiana's Death Penalty Statute

A. *Use of "Special Verdict" Forms*

Wilkes challenges the provision in Indiana's death penalty statute that a penalty phase jury "shall provide a special verdict form for each aggravating circumstance alleged." Ind. Code § 35-50-2-9(d) (2004). Wilkes contends this provision is invalid because it conflicts with Indiana Trial Rule 49, which abolished "special verdicts," and therefore violates the separation of powers required by Article 3 of the Indiana Constitution by invading the province of the Judiciary.

The findings required by the statute to be reflected in the document referred to by the statute as a "special verdict form" are qualitatively different from the special verdicts to which Trial Rule 49 refers. In a conventional trial contemplated by Trial Rule 49, the jury must resolve all matters submitted to it. Special verdicts were abolished to eliminate the confusion and lack of finality generated by a maze of potentially confusing subsidiary questions. But the form required by the death penalty statute does not ask for preliminary or subsidiary findings leading to the ultimate verdict. Rather, it sets out the jury's findings as to the ultimate facts required to be resolved by the jury in a death penalty case. The jury may, but is not required to, reach a recommendation as to the penalty. The form thus documents whether the jury finds the defendant eligible for the enhanced penalty.

Use of the form is necessitated by the Sixth Amendment right to jury trial as applied to the two-phased trial required by the death penalty statute. The Indiana death penalty statute requires that one or more statutorily identified "aggravating circumstances" be found before a defendant is eligible for the death penalty. I.C. § 35-50-2-9(a). In this case, these circumstances were multiple murders and a killing of a child under twelve years of age. The statutory provision for special verdicts is designed to assure compliance with the federal constitutional requirements announced in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002). These cases established that the Sixth Amendment requires that the jury find all matters necessary to enhance the punishment. Because the Sixth Amendment to the Federal Constitution requires these jury findings, we do not regard the statute as conflicting with the general prohibition against special verdicts. Rather, it provides a necessary step in determining whether the defendant is eligible for the death penalty. We therefore accept the provision for special verdicts as a proper means of implementing the requirement that a statutory aggravating circumstance be found by a jury before a defendant is eligible for the death penalty.

B. *Sentencing by the Court*

Under Indiana's death penalty statute, if the jury makes a recommendation as to sentence, the trial court is to sentence "accordingly." I.C. § 35-50-2-9(e). The following subsection, I.C. § 35-50-2-9(f), provides that if a jury is unable to reach a recommendation as to penalty, the court is to proceed "as if the hearing had been to the court alone." Wilkes argues that, as a matter of statutory construction, this section does not allow the court to rely on the jury findings as to

14

aggravators or weighing. We agree that the trial court must make its own determination whether the aggravating circumstance is established beyond a reasonable doubt and whether the aggravators outweigh the mitigating circumstances.

We take the quoted language from subsection (f) to mean the court is to sentence as it would have if the case had been tried without a jury. We note that this Court implicitly adopted that view in State v. Barker:

> It is thus conceivable that a penalty phase jury could return a verdict finding one or more aggravators proven beyond a reasonable doubt, but be unable to reach unanimous agreement on whether any mitigating circumstances are outweighed by the aggravating circumstances. Where a jury is thus unanimous in finding one or more aggravating circumstances proven beyond a reasonable doubt but unable to agree on a sentence recommendation, Subsection 9(f) applies to instruct that the court shall "discharge the jury and proceed as if the hearing had been to the court alone." In this event the trial court shall, based upon the evidence presented to the penalty phase jury, impose a sentence of death or life without parole . . . or it may impose a term of years.

809 N.E.2d 312, 316 (Ind. 2004). This does not imply that the jury's findings as to aggravators or weighing are to be disregarded. To the contrary, Apprendi and Ring require that the jury find a statutory aggravating circumstance. Without this finding, the defendant's eligibility for the death penalty is not established, and no further consideration of the death penalty is required.

If the jury makes the requisite findings but cannot agree on a recommended sentence, subsection (f) requires the trial court to proceed "as if the hearing had been to the court alone." Subsection (g) requires the trial court to make the findings identified in subsection (*l*) "[i]f the hearing is to the court alone." One of the findings described in subsection (*l*) is that the State has proved beyond a reasonable doubt that at least one statutory aggravator exists. Subsection (*l*) also requires the trial judge to find the aggravating circumstance established beyond a reasonable doubt. The trial court here properly made these subsection (*l*) findings. Wilkes thus received the benefit of the requirement under the Sixth Amendment that the jury find the aggravating circumstances, and also the Indiana requirement that the trial judge independently arrive at the same finding.

Amicus curiae Marion County Public Defender Agency argues that the directive in subsection (f) to proceed "as if the hearing had been to the court alone" limits the trial court to imposing a term of years because the trial court is limited to a term of years in non-death penalty

15

and life without parole cases where it sentences "alone." Amicus also argues that the death penalty statute creates a right to a jury determination of penalty, making a new penalty phase the proper remedy if the jury fails to make a recommendation. As we have explained, we think the 2002 amendments were intended to conform Indiana's statute to the requirements of Apprendi and Ring. If there has been no waiver of jury trial, a jury must find the aggravating circumstances, but the death penalty statute also permits a court sentencing to take place if a jury has been waived. I.C. § 35-50-2-9(d)-(e). We think that if the jury finds aggravating circumstances but cannot agree on a recommendation, this statute merely permits the court to exercise its sentencing function "as if" the entire case had been tried without a jury. The result is that the requirements of subsection (f) apply, including the requirement that the trial court independently find the aggravating circumstances. But it does not convert the entire case to one tried free of the death penalty provisions.

### C. *Violation of Ring v. Arizona*

The United States Supreme Court held in Ring v. Arizona that capital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in maximum punishment. 536 U.S. at 589. Wilkes argues that under Ring, a jury must find that aggravators outweigh mitigators and that death is appropriate. This Court addressed this issue in Ritchie v. State, holding

> the federal constitution requires that eligibility for the death penalty be determined by the jury beyond a reasonable doubt, but it does not require that the decision whether to impose death be made by the jury, and it does not require the weighing, whether by judge or jury, to be under a reasonable doubt standard.

809 N.E.2d 258, 266 (Ind. 2004), cert. denied, 546 U.S. 828 (2005). We reaffirm that view.

### IV. Sentencing Issues

### A. *Counsel's Concession of Aggravators and that Aggravators Outweighed Mitigators*

Wilkes argues that the trial court erred in finding that Wilkes conceded that all the aggravators were proved beyond a reasonable doubt and the aggravators outweighed the mitigators.

16

Statements by counsel in closing argument may be sufficient to constitute admission of an aggravator. Trusley v. State, 829 N.E.2d 923, 926 (Ind. 2005) (counsel's statement "that the victim of the crime was less than twelve years of age" was an admission).

In opening statement and closing argument of the penalty phase, defense counsel made several statements that could be viewed as concessions. These include:

> We're not offering excuses or justifications for what happened. They're three innocent people that were brutally murdered and there's a weighing that the Court has instructed you to do. When you take those lives that were taken, there is no— there is no mitigating evidence, there's nothing about Danny's past or his upbringing that can possibly ever outweigh those three lives that were lost . . . .
>
> . . . .
>
> We offer no excuse for the conduct that resulted in their horrific death . . . but you've found him guilty of that and we acknowledge that the basis for bringing this charge that we'll ask you to recommend to the Court that Danny Wilkes be executed is based on the aggravating circumstances that . . . more than one person and one of those people under the age of 12, that's what the aggravating circumstances are in this case, and we think there is nothing worse than that.
>
> . . . .
>
> [W]e believe that the information that's been provided to you through these witnesses should convince you and will convince you that Mr. Wilkes deserves to spend the rest of his life in prison. . . .

Like the death penalty, imposition of life without parole requires a finding of a statutory aggravator and that the aggravator outweighs mitigators. These statements of counsel, like those in Trusley, are therefore sufficient to constitute admissions to both multiple murders and a victim under twelve years old, and also that the aggravators outweighed the mitigators. The trial court did not err in finding that counsel conceded these issues. The jury found these aggravators proved beyond a reasonable doubt and also that they outweighed any mitigators. The trial court in its sentencing order expressed its independent judgment that the aggravators were proved and that they outweighed the mitigators. Whether defense counsel conceded these matters is therefore of no significance.

17

B. *Adjustment to Incarceration as a Mitigating Circumstance*

At his sentencing hearing, Wilkes presented evidence that he had adjusted to incarceration, behaved well in prison, and could safely serve a sentence of life without parole. Wilkes argues that the trial court was required to consider this evidence as a mitigating circumstance and that the court did not do so.

Wilkes cites Skipper v. South Carolina, 476 U.S. 1, 4 (1986) for the proposition that adjustment to incarceration is a mitigating circumstance that the trial court was required to consider. In Skipper, the trial court excluded evidence of the defendant's good behavior in prison. The Supreme Court reversed and held that this evidence could not be excluded from the sentencer's consideration because it might have served as a basis for a sentence less than death. Id. at 5. The Supreme Court remanded for a new sentencing hearing in which the defendant could "present any and all relevant mitigating evidence that is available." Id. at 8. We agree that Skipper established that positive adjustment to incarceration is relevant mitigating evidence and may not be excluded from the sentencer's consideration. As the Court noted, this is an application of the general rule that "the sentencer may not refuse to consider . . . any relevant mitigation evidence." Id. at 4 (quotation omitted) (citing Eddings v. Oklahoma, 455 U.S. 104, 114 (1982); Lockett v. Ohio, 438 U.S. 586, 604 (1978)). More recently the Supreme Court reaffirmed that "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." Weeks v. Angelone, 528 U.S. 225, 232 (2000); see also Tennard v. Dretke, 542 U.S. 274, 285–87 (2004) (discussing Skipper with approval).

Unlike the defendant in Skipper, Wilkes was not prevented from presenting this evidence to the jury. Although the trial court is obligated to receive and consider mitigating factors, the trial court is not obligated to accept the defendant's contentions as to what constitutes a mitigating circumstance or to give the proffered mitigating circumstances the same weight the defendant does. Gross v. State, 769 N.E.2d 1136, 1140 (Ind. 2002). Nor is the trial court obliged to accept the opinions of experts. Thompson v. State, 804 N.E.2d 1146, 1149 (Ind. 2004). The trial court is required to accept as mitigating a circumstance that is established by the facts and as a matter of law is to be considered. Anglemyer v. State, 868 N.E.2d 482, 490–91

(Ind. 2007), <u>reh'g granted</u>, 875 N.E.2d 218 (Ind. 2007). But it is not reversible error to fail to consider a factor that is not significant in relation to all the circumstances of the case. <u>Anglemyer</u>, 875 N.E.2d at 220-21 (opinion on rehearing).

Here, the trial court was required to consider all evidence relevant to mitigation, which, as the Supreme Court held in <u>Skipper</u>, includes evidence of positive adjustment to incarceration. The jury heard this evidence and found that the aggravating circumstances outweighed the mitigating circumstances as a whole. After the jury was unable to reach a recommendation as to the sentence, the trial court independently evaluated the aggravating and mitigating circumstances. With regard to the evidence that Wilkes adjusted well to incarceration, the court's sentencing order states:

> Defense counsel suggests that a mitigating circumstance is that the defendant can be safely incarcerated and punished within the Indiana Department of Corrections. The Court does not find that this is a mitigating circumstance.

We do not agree with Wilkes's contention that this language demonstrates that the trial court failed to consider Wilkes's adjustment to incarceration as a mitigating circumstance. The trial court used identical language in response to the claim that Wilkes had no significant history of prior criminal conduct, which has long been recognized as a potential mitigating circumstance. We take these as statements that the trial court weighed these proffered mitigating circumstances and determined that in this case neither was entitled to significant weight.

The court, like the jury, after hearing the proffered evidence, ultimately concluded that the aggravating circumstances outweighed the mitigating circumstances. Under <u>Skipper</u>, this is all that is required. The court also independently determined that the death sentence should be imposed after considering all of the aggravating and mitigating circumstances. Under the circumstances of this case—a triple murder including two children—we cannot say that the trial court abused its discretion.

## C. *Sydne's Age as an Aggravating Circumstance*

Wilkes argues that his Sixth Amendment rights were violated because the fourth aggravating circumstance—that one of the victims was less than twelve years old—was not found beyond a reasonable doubt by a jury. Wilkes contends that the age of the victim was not an element of murder so that issue was never presented to the jury or returned in a verdict by

19

proof beyond a reasonable doubt. But during the guilt phase of trial, the State presented undisputed evidence that Sydne was eight years old. At the penalty phase, the jury returned a verdict form finding that "the State of Indiana has proven beyond a reasonable doubt the charged aggravating circumstance that . . . the victim of that murder, Sydne Claspell, was less than twelve (12) years of age." Evidence at the guilt phase may be considered at the penalty phase. I.C. § 35-50-2-9(d) ("The jury or the court may consider all the evidence introduced at the trial stage of the proceedings . . . ."). The evidence of Sydne's age presented in the guilt phase was sufficient to support the jury's finding in the penalty phase as to this aggravating circumstance.

D. *Consideration of Other Criminal Acts*

Wilkes argues that the trial court erred in considering his molestation of Avery in determining whether to find Wilkes's lack of serious criminal history as a mitigating circumstance. In its sentencing order the trial court found

> that the defendant had no prior felony convictions. He did have five (5) misdemeanor convictions, four (4) of which were alcohol offenses. He was also charged with felony non-support in the Pike Circuit Court, which case was recently dismissed because of the defendant's convictions in this case. Finally, the defendant has admitted that, prior to the date of the murders herein, and on one or more occasions, he committed the crime of child molesting with regard to victim Avery Pike.

Wilkes contends that the corpus delicti rule precluded the trial court from considering his sexual activity with Avery because no evidence other than his confession was offered to establish the sexual activity.

As explained in Part II.A., supra, the corpus delicti rule serves to prevent conviction for crimes that never occurred. It does not prohibit consideration in sentencing of facts admitted by the defendant. Uncharged crimes may be considered in assessing "lack of criminal history" as a claimed mitigating circumstance. Rouster v. State, 600 N.E.2d 1342, 1348–49 (Ind. 1992). Similarly, relevant evidence of another crime is admissible to rebut the defendant's claimed lack of criminal history even if that evidence may not be sufficient to support a conviction. The trial court did not err in considering Wilkes's admitted sexual activity with Avery to rebut Wilkes's claimed lack of criminal history.

20

E. *The Jury's Failure to Recommend a Sentence*

Wilkes argues that this Court should remand for resentencing because the trial court should have considered as a mitigating factor the jury's inability to arrive at a unanimous sentencing recommendation. Wilkes notes that Indiana Code subsection 35-50-2-9(c)(8) permits the trial court to consider any other circumstances appropriate for consideration as mitigators. He contends that the jury's failure to recommend a sentence is a factor to be considered in mitigation. The State responds that subsection (f) implies that the jury's inability to recommend a sentence is irrelevant because in that case sentencing "shall proceed as if the hearing had been to the court alone."

This Court has previously divided over this issue. In Roche v. State, 596 N.E.2d 896 (Ind. 1992), the jury was discharged after being unable to reach a recommendation, and the trial court imposed a sentence of death. This Court held that "[N]o meaning should be interpreted from the jury's failure to reach a recommendation. Likewise, the failure to reach a recommendation should not be considered as a mitigating factor during the penalty phase." Id. at 899. Justice DeBruler, joined by Justice Krahulik, dissented, reasoning that

> the quandary of the jury represents at least the sentiment of one conscientious juror, who survived voir dire, who heard the shocking evidence of sudden injury and death, who voted for conviction, and finally whose conscience could not support imposition of the death penalty. In my opinion, that sentiment cannot rationally be rejected as a mitigating circumstance as falling within the catch-all . . . . The weight of it is not great, falling I would say in the low range.

Id. at 902.

The view of the Roche majority was upheld in Burris v. State, 642 N.E.2d 961 (Ind. 1994), despite Justice Sullivan's separate opinion, which agreed with Justice DeBruler's dissent in Roche. The Roche and Burris majority opinions were also upheld in Holmes v. State, 671 N.E.2d 841 (Ind. 1996), where Justice DeBruler wrote for the majority:

> this court has twice held over vigorous dissent, including that of the author of this opinion, that a jury's inability to reach a recommendation need not be considered as a mitigating circumstance and has no effect upon subsequent court sentencing procedure.

Id. at 851. Finally, in Dunlop v. State, 724 N.E.2d 592, 600 (Ind. 2000), Justice Sullivan's dissenting opinion, joined by Justice Rucker, mentioned the jury's inability to reach a unanimous

recommendation as a mitigating circumstance in a life without parole case, but this issue was not addressed by the majority.

In this case, the trial court considered itself bound by Roche and concluded that it could not consider the jury's lack of recommendation in selecting a penalty. The trial court noted that subsequent statutory amendments and case law could be viewed as relevant to the issue, but appropriately left any change in the law to this Court.

We last visited this issue in 1996. In 2002, the General Assembly amended the death penalty statute to make the jury's sentencing recommendation binding on the judge in most circumstances. I.C. § 35-50-2-9. We think this increased emphasis on the role of the jury provides a reason to reconsider the Roche line of cases. The lack of unanimity among the jurors does not bear on the defendant's conduct or any facts that tend to lessen his culpability. It does, however, demonstrate a level of uncertainty among the citizens who considered the evidence as to the appropriate penalty. It is therefore more properly considered a relevant consideration than a mitigating circumstance, but it is a factor the trial court should be permitted to consider in determining the appropriate sentence. We therefore reach the same result as the Roche and Burris dissenters and hold that it is "appropriate" for the trial court to consider the fact that the jury—whose recommendation would otherwise be binding—could not agree. We do not find the trial court's adherence to then-existing precedent to be error, much less reversible error. The trial court expressly stated its independent conclusion that the aggravating circumstances outweighed the mitigating circumstances and thus the death penalty was appropriate.

F. *Appellate Rule 7(B) Claim*

Article 7, Section 4 of the Indiana Constitution gives this Court power in all criminal appeals "to review and revise the sentence imposed." Indiana Appellate Rule 7(B) provides that this Court may revise a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Wilkes requests this Court to consider all of his arguments and his individual characteristics and determine that his death sentences are inappropriate.

Wilkes presented evidence regarding his character. As the trial court found, Wilkes has no prior felony convictions. However, he did admit to drug use and to molesting Avery on

22

multiple occasions.  Wilkes presented evidence of a terrible childhood, including neglect, physical abuse, sexual abuse, alcoholic parents, removal from the home, and time in institutions. Wilkes also presented evidence that he is addicted to several drugs and has suffered from long-standing depression since the age of eleven.  Finally, Wilkes argues that he can be safely incarcerated and that his life has and will continue to show "redeeming qualities," such as helping others.  We believe that these factors have some mitigating weight, as does the fact that the jury could not agree on a sentencing recommendation.  As in all sentencing, however, we give considerable deference to the ruling of the trial court.  We cannot say that the death sentences in this case are inappropriate.  The nature of the offense is a triple murder of a mother and her two children.  The murders, especially of Donna and Sydne, were committed in a particularly gruesome manner.  We have upheld death sentences in similar cases.  E.g., Ward v. State, 903 N.E.2d 946, 962–63 (Ind. 2009) (upholding death sentence for "brutal and savage slaying" and rape of fifteen-year-old girl); Baer v. State, 866 N.E.2d 752, 766 (Ind. 2007) (upholding death sentence for "brutal and savage slaying of a four-year old and her young mother").

## Conclusion

Wilkes's convictions and death sentence are affirmed.

Shepard, C.J., and Sullivan and Rucker, JJ., concur.

Dickson, J., concurs in result with separate opinion.

23

**Dickson, Justice, concurring in result.**

I concur except with respect to the Court's departure from <u>Roche v. State</u>, 596 N.E.2d 896 (Ind. 1992), and its progeny. I continue to believe that a jury's inability to reach a unanimous sentencing recommendation is logically unrelated to the defendant's conduct or personal circumstances and thus is irrelevant as a consideration in determining the appropriate sentence for a defendant.