Imari BUTLER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A04–1012–CR–0775.

Court of Appeals of Indiana.

Aug. 12, 2011.

Danielle L. Gregory, Marion County Public Defender, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Andrew Falk, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Imari Butler (Butler), appeals his convictions for Count I, rape, a Class B felony, Ind.Code § 35–42–4–1; Count II, criminal deviate conduct, a Class B felony, I.C. § 35–42–4–2; Count V, criminal confinement, a Class C felony, I.C. § 35–42–3–3; and Count VI, sexual battery, a Class D felony, I.C. § 35–42–4–8.

We affirm.

### ISSUE

Butler raises two issues on appeal, one of which we find dispositive and restate as follows: Whether the trial court abused its discretion in admitting portions of Butler's taped statement.

### FACTS AND PROCEDURAL HISTORY

On April 1, 2009, B.G. went to a club in Indianapolis along with two friends, Andrea Ward (Ward) and Leslie Cranny (Cranny). B.G. did not take a purse with her to the club, so she put her cell phone in Cranny's purse. While they were at the club, B.G. drank a Tequila Sunrise drink, two shots of liquor, and two beers. When they left around 2 a.m., Ward felt intoxicated, so B.G. and Ward sat in Ward's car for about half an hour until Ward felt sober enough to drive home. Cranny drove to her home separately.

Once B.G. and Ward reached their apartment, B.G. realized she had left her cell phone in Cranny's purse, so she called Cranny from Ward's phone and told Cranny that she was coming over to pick it up. Cranny gave her the address, and B.G. scanned the directions from the GPS on

Ward's phone. However, when B.G. left, she did not bring Ward's phone with her. On her way to Cranny's house, B.G. confused Speedway with Raceway, where Cranny lived, and got lost.

As she was driving down Interstate 65, B.G. hit a pothole and got a flat tire. She exited at 38th Street, which was the first exit she crossed, and pulled into a gas station to examine her tire. When B.G. realized that she needed to change her tire, she sat back down in her car and started to cry because she was lost and did not know how to change a tire. At that point, Butler approached her and asked what was wrong. B.G. told him that she was lost, did not have a phone, and did not know how to change a tire. In response, Butler told her to pull her car to the side of the gas station so that he could change it for her. She did so, and Butler helped her change her tire.

After Butler finished helping B.G. with her tire, B.G. offered him five dollars, but he asked for a ride instead. B.G. agreed, and drove down several side streets branching off of 38th Street. At one point, B.G. started to cry again because she was still upset about getting lost, and Butler asked her why she was crying. B.G. told him that she was still upset, and he wiped a tear from her face. Then he grazed his hand over her underwear. B.G. smacked his hand away and told him to stop. Butler became very demanding and very angry, telling her to turn off the lights and stop the car. B.G. sped up the car, and Butler punched her on the right side of her face with a closed fist. After that, B.G. stopped her car. Butler started opening things in her car and told her to give him her money or he would kill her. He also hit her a second time.

Once Butler had finished rummaging through B.G.'s car, he unzipped his pants, pulled out his penis and told B.G. to "suck it bitch." (Transcript p. 41). B.G. told him no, so he punched her again, grabbed her by the hair, and forced his penis into her mouth. After Butler released his grip on her head, he zipped his pants up and walked around the front of her car. At that point, B.G. put her car into drive and started to pull forward. She did not accelerate quickly enough, though, and Butler came up onto the car and grabbed her collar through the driver's side window. He told her to stop the car or he would kill her. B.G. stopped the car, and Butler opened the driver's side door and pulled B.G.'s seat back. He then had intercourse with her against her will.

When Butler was finished, he exited the vehicle, gave her directions to the highway, and walked off. B.G. returned home and her roommate, Amber Laibe (Laibe), took her to the hospital. Annie Walker (Walker), a registered nurse and sexual assault nurse examiner at St. Vincent Hospitals, examined B.G. when she checked in to the hospital at 5 a.m. on April 2, 2009. When Walker met B.G., B.G. had an ice pack on the right side of her face and was crying. She could not open her mouth all of the way to speak due to an injury to her jaw, and she had bruises and swelling along the right side of her face. B.G. also had an abrasion on her lower inner right forearm area, abrasions on her back, bruising and swelling on her neck, and broken nails on both hands.

During the examination, Walker collected samples from B.G.'s pelvis and mouth. Indianapolis Metropolitan Police Department Detective Laura Smith (Detective Smith) took over the investigation. The Police Department received information that led Detective Smith to believe Butler might be a suspect in B.G.'s attack, and she presented B.G. with a photo array that included Butler's picture. B.G. identified Butler as the person who had attacked her. On April 4, 2009, Detective Smith

learned that Butler had been detained, and she took custody of him. Subsequently, she advised him of his rights and conducted an interview of him that was audio and video recorded.

At that point, Detective Smith obtained a warrant to search Butler's body. Laura Maloy (Maloy), a nurse, conducted the search. Maloy took a penile swab, pubic and head hair combings, and blood samples from Butler during the examination. Based on this search, Tonya Fishburn (Fishburn), a forensic scientist at the Marion County Crime Lab, determined that Butler's DNA matched DNA found on anal and vaginal swabs taken during B.G.'s examination. Fishburn also found sperm in B.G.'s dental sample, but not enough to make a DNA identification. Subsequently, police detectives discovered B.G.'s flat tire discarded at a Shell Gas Station on 38th Street and Capitol Avenue and matched DNA evidence and fingerprints in B.G.'s car to Butler.

On April 6, 2009, the State filed an Information charging Butler with Count I, rape, a Class B felony, I.C. § 35–42–4–1; Count II, criminal deviate conduct, a Class B felony, I.C. § 35–42–4–2; Count III, robbery, a Class B felony, I.C. § 35–42–5–1; Count IV, criminal confinement, a Class C felony, I.C. § 35–42–3–3; Count V, criminal confinement, a Class C felony, I.C. § 35–42–3–3; Count VI, sexual battery, a Class D felony, I.C. § 35–42–4–8; and Count VII, theft, a Class D felony, I.C. § 35–43–4–2. On May 18, 2009, the State filed an additional Information charging Butler with being an habitual offender, and on February 22, 2010, the State filed an Amended Information dismissing Counts III, IV, and VII.

On November 3 and 4, 2010, a jury trial was held. At the conclusion of the evidence, the jury found Butler guilty of Count I, rape; Count II, criminal deviate conduct; Count V, criminal confinement; and Count VI, sexual battery. Butler also stipulated to being an habitual offender. Subsequently, on December 3, 2010, the trial court sentenced Butler to fifteen years incarceration for Counts I and II, and one and one half years for Count VI. The trial court also merged Count V into Count II and ordered Counts I and II to run consecutively and concurrent with Count VI. In addition, the trial court ordered 30 years attached to Count I since Butler was an habitual offender. In the aggregate, Butler received a sixty year executed sentence, which the trial court ordered 56 years to be spent in incarceration and 4 years in community corrections.

Butler now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

On appeal, Butler argues that the trial court erred in admitting portions of his taped interview with Detective Smith. When the State tried to admit the evidence at trial, Butler objected, arguing that the testimony was inadmissible. On May 27, 2010, the trial court held a redaction hearing and issued an order editing several portions of the statement. Butler had requested that the trial court redact inadmissible hearsay statements, references to his prior crimes, the detectives' assertions of fact, and the detectives' opinions about Butler's character and guilt, but the trial court only granted some of the requests. Butler challenges the following excerpts of the statements that the jury heard and saw as part of the redacted transcript and video:

Q. Imari[,] you believe your own lies?

A. Uh, I ain't gonna lie.

Q. Imari[,] this young lady did not have sex with you consensually. You know it and I know it. . . .

(State's Exh. 50 p. 101).

A. If, if, if you, if you pulled down your clothes [ ] and pulled your chest out and

let a man suck on your chest without sayin[g] stop or nothing[g], what is that?

Q. So, she is a whore?

A. I'm not saying that. Everybody [who has] sex is not no whore....

(State's Exh. 50 p. 110).

Q. When a person is remorseful it shows they have [a] pretty decent character. When a person is not, then there is no reason at all to think that you're anything but a monster.

A. But I, I, I'm not a monster....

A. I understand what you're saying, where you're comin[g] from. But I did not rape that lady. That's what I'm tryin[g] to tell you. I did not rape.

Q. And for you to say that, is calling her a liar.

A. But.

Q. You are basically saying she is a liar....

(State's Exh. 50 p. 114).

Q. ... This is good for me. She's the angel. You're the monster....

(State's Exh. 50 p. 115).

Q. So if there's a shred of decency, somebody in your life, someone in your life[,] whether it be a teacher, a minister, pastor, reverend, someone who has attempted to tell you how to be a good person and how to be a man. And men don't sit here and not take responsibility. When [they are] wrong, [they are] wrong. You swallow it. You suck it up and say ["I'm wrong."] And to be unable to do that says you are a coward and someone who has no morals, no [conscience] whatsoever. Is that you?

(State's Exh. 50 p. 117).

Q. No, because what you are doing is, I have been with this lady for two days. She has cried. And for you to sit here and say that you didn't rape her, is disturbing. You either want me to tell

her that you're sorry or you want me to tell her to go [f* * *] herself. That's, that's where we are.

(State's Exh. 50 p. 118). According to Butler, these excerpts contain inappropriate and prejudicial opinions, inappropriate statements of fact, and inflammatory comments on his character.

■■■ In Indiana, a trial court has broad discretion in ruling on the admissibility of evidence. As a result, we review the admission of evidence for an abuse of the trial court's discretion. *Heyen v. State*, 936 N.E.2d 294, 299 (Ind.Ct.App. 2010), *trans. denied.* An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* We do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling. *Id.*

■■■ As a general principle, hearsay, which is an out-of-court statement offered to prove the truth of the matter asserted, is not permitted at trial. Ind. Evidence Rule 801(c). A statement is not hearsay, though, if it is not offered to prove the truth of the matter asserted. *Smith v. State*, 721 N.E.2d 213, 216 (Ind.1999). The Indiana Supreme Court has held that a detective's questions and statements during an interview with a defendant that are designed to elicit a response from the defendant are not presented to prove the truth of the matters asserted. *Id.* Statements that might otherwise be admissible, though, must still adhere to additional rules of evidence. As relevant in this case, Indiana Rule of Evidence 704(b) states that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Also, Indiana Rule of Evidence 404(a) provides that "[e]vidence of a pertinent trait

of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: (1) [e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same. . . ."

In *Smith*, our supreme court addressed the issues we are confronted with in the instant case. *Smith v. State*, 721 N.E.2d 213, 216 (Ind.1999), *reh'g denied*. There, the State attempted to submit a taped interview between a police detective and the defendant into evidence at trial. *Id.* After a lengthy conference, the trial court admitted an edited version of the tape. *Id.* On appeal to the supreme court, Smith argued that three of the detective's statements in the tape asserted the detective's opinion of Smith's guilt. *Id.* The first two statements at issue were the detective's statements that "half of the people at the jail's [sic] called me wanting to tell me that you did it," and "[Lampley] said you did it because it was over him [Riggs] ripping you off your dope, your stash." *Id.* The supreme court determined that the fact that the statements appeared to be assertions of fact by the detective rather than mere questions—coupled with the fact that the trial court had not given a limiting instruction to the jury—rendered their admission error. *Id.* Similarly, the supreme court also found that the detective's statement "I thought it was you" to Smith was inadmissible due to Evidence Rule 704(b)'s prohibition against opinions of guilt. *Id.* at 217.

In *Wilkes*, our supreme court held that it was error for the trial court to admit a detective's statement to a defendant that "[i]t happened. And you were there, you were there and we know it, and you know it, or we would [not] be up here." *Wilkes v. State*, 917 N.E.2d 675, 686 (Ind.2009), *reh'g denied, cert. denied.* The *Wilkes* court, though, held that the error was harmless because the statement was only "one line in an over one-hundred page interview transcript and several days of evidence." *Id.*

■ Based on the precedent in *Smith* and *Wilkes*, we agree with Butler that the trial court erred in admitting many of the statements in his taped interview. Detective Smith's statement "Imari[,] this young lady did not have sex with you consensually. You know it and I know it" is very similar to the detective's statement in *Wilkes* that "you were there and we know it, and you know it. . . ." (State's Exh. 50 p. 101); *Wilkes*, 917 N.E.2d at 686. It inappropriately asserts her opinion of his guilt.

■ However, even though we find that the trial court erred in admitting many of Detective Smith's statements, we hold that, as in *Wilkes*, the error was harmless. The improper admission of hearsay evidence does not require reversal where, excluding the erroneously admitted hearsay evidence, there remains ample evidence to sustain the conviction. *Snellgrove v. State*, 569 N.E.2d 337, 344 (Ind. 1991). Also, in Indiana, the uncorroborated testimony of the victim of a sexual crime alone is sufficient to sustain a conviction. *Holeton v. State*, 853 N.E.2d 539, 541 (Ind.Ct.App.2006).

Here, there was more than sufficient evidence to sustain Butler's convictions. According to B.G.'s testimony, Butler hit and punched her multiple times and had intercourse with her against her will. In addition, the physical evidence corroborated B.G.'s testimony. DNA evidence taken from Butler matched swabs taken during B.G.'s examination, and police detectives discovered Butler's DNA and fingerprints in B.G.'s car. Moreover, B.G.'s flat tire was found at a Shell Gas Station on 38th Street and Capitol Avenue, and the testimony of B.G.'s friends corroborated that B.G. was screaming that she had been

raped when she returned to her apartment and had bruises on her face that she had not had before.

In light of these facts, we conclude that the trial court abused its discretion in admitting portions of Butler's taped interview, but we will not reverse Butler's convictions because the error was harmless.[1]

### CONCLUSION

Based on the foregoing, we conclude that the trial court abused its discretion in admitting portions of Butler's taped statement, but that error was harmless.

Affirmed.

NAJAM, J., and MAY, J., concur.

1. Butler also argues that the trial court erred in assessing court fees, fines, and costs against him in the amount of $514.00. He claims that during his sentencing hearing on December 3, 2010, the trial court verbally ordered "[a]ny costs, fines, and fees waived," and the abstract of judgment does not list any costs, fines, or fees against him. (Appellant's Br. p. 11); (Appellant's App. pp. 36–7). However, the chronological case summary indicates that the trial court assessed costs, fines, and fees with a combined total of $514.00.

In *McElroy*, our supreme court held that "[t]he approach employed by Indiana appellate courts in reviewing sentences in non-capital cases is to examine both the written and oral sentencing statements to discern the findings of the trial court." *McElroy v. State*, 865 N.E.2d 584, 588 (Ind.2007). Accordingly, we have examined the trial court's oral sentencing statement and abstract of judgment and determine that the costs, fines, and fees assessed in the chronological case summary were a clerical error. The trial court unambiguously expressed its intent to waive those amounts, and both the sentencing statement and abstract of judgment reflect that intent.