**FOR PUBLICATION**



FILED

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GILDA W. CAVINESS**
Caviness Law Office, LLC
Rushville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW R. FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANTHONY L. COLE | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 73A01-1107-CR-310 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE SHELBY CIRCUIT COURT
The Honorable Jack A. Tandy, Judge
Cause No. 73C01-1010-FA-12

**April 16, 2012**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

Following a jury trial, Anthony Cole was convicted of Burglary[1] as a class A felony; Robbery[2] as a class B felony; Criminal Confinement[3] as a class B felony; Intimidation with a Deadly Weapon,[4] a class C felony; Theft[5] as a class D felony; Criminal Gang Activity[6] as a class D felony; and Carrying a Handgun Without a License,[7] a class A misdemeanor. Thereafter, Cole admitted to being a Habitual Offender.[8] Inclusive of the habitual offender enhancement, the trial court sentenced Cole to an aggregate sentence of fifty years. On appeal, Cole presents the following issues for our review:

1. Is the evidence sufficient to support Cole's conviction for class D felony criminal gang activity?

2. Do Cole's convictions for burglary, robbery, criminal confinement, intimidation with a deadly weapon, theft, and carrying a handgun without a license violate the double jeopardy clause of the Indiana Constitution?

3. Is Cole's habitual offender enhancement proper?

We affirm in part, reverse in part, dismiss in part, and remand.

Jerry Ayers stopped smoking in 1992. Since that time, Ayers would accumulate one- and five-dollar bills as his non-smoking savings. Ayers folded the bills in half and kept the money in varying bunches, each wrapped with colored rubber bands. Ayers stored all of his cash savings in this manner and kept the money in a safe in his garage. Years later, Ayers began having some medical issues, so he started selling marijuana. Ayers purchased the

---

[1] Ind. Code Ann. § 35-43-2-1 (West, Westlaw current through 2011 1st Regular Sess.).
[2] Ind. Code Ann. § 35-42-5-1 (West, Westlaw current through 2011 1st Regular Sess.).
[3] I.C. § 35-42-3-3 (West, Westlaw current through 2011 1st Regular Sess.).
[4] Ind. Code Ann. § 35-45-2-1 (West, Westlaw current through 2011 1st Regular Sess.).
[5] I.C. § 35-43-4-2 (West, Westlaw current through 2011 1st Regular Sess.).
[6] I.C. § 35-45-9-3 (West, Westlaw current through 2011 1st Regular Sess.).
[7] Ind. Code Ann. § 35-47-2-1 (West, Westlaw current through 2011 1st Regular Sess.).

marijuana from Robbie McColley. Ayers kept his money from the sale of marijuana in his bedroom, separate from his non-smoking savings. Ayers estimated that he had as much as $8000 in his bedroom, but did not know how much cash he had in his safe in the garage other than to say it was a "great deal more" than $20. *Transcript* at 266. Ayers also owned two guns and a holster that he kept in his safe in the garage.

McColley had been to Ayers's home numerous times and knew of the location of the safe in Ayers's garage. On one occasion, McColley introduced Ayers to a man Ayers knew only as Blade. Blade's real name is Edward LeFlore. McColley brought LeFlore to Ayers's home the previous winter so LeFlore could inquire about buying a car from Ayers. Ayers had never before met Cole, the defendant in this case.

In October 2010, Ayers and his step-daughter, Lisa Boswell, lived at Ayers's home in Fairland, Indiana. On October 4, 2010, Ayers was away from the home, but Boswell was there with her twenty-one-year-old step-daughter, Katina. That evening, Boswell was in the kitchen cleaning while Katina was in another room watching television. Around 8:00 p.m., the women heard a loud noise and then saw Cole kick through the front door. Cole and a second individual barged through the door and Cole identified himself and the second intruder as police officers, and, while pointing a gun, ordered Boswell and Katina to lie face down on the floor. Cole and the second individual were dressed in black and both were wearing black shirts that said "Police" or "K-9 Unit" on them. *Transcript* at 343. They were also wearing ski masks and black gloves. The women described Cole, the first intruder through the door, as a stocky black man, "a big, broad guy" with "great big arms" and a calm

---

[8] Ind. Code Ann. § 35-50-2-8 (West, Westlaw current through 2011 1st Regular Sess.).

3

demeanor. *Id.* at 305. The women described the second individual through the door as a "tall, slender guy" who had a loud voice and an active demeanor. *Id.* at 304.

Boswell did not immediately comply with Cole's command, so Cole came across the living room and stood close to Boswell, pointed the gun at her, and again ordered her to lie on the floor. Boswell complied with Cole's second command, and then Cole patted her down, asked if she had anything on her, and tied her hands behind her back with zip ties. The second intruder went to Katina and helped her to the floor. When Cole finished securing Boswell's hands behind her back, he moved to Katina and secured her hands behind her back with zip ties. Cole told Boswell and Katina to keep their faces down and not look up. Cole was acting like a police officer and seemingly talking to other officers on a radio reporting that the house was secure so other officers could enter.

The second intruder went to the back of the house and looked in all of the rooms while asking if anyone else was in the home. He then went into Ayers's room and Boswell and Katina could hear him making a lot of noise as he was ransacking Ayers's room.

While the second intruder was in Ayers's room, Cole, who was standing over Boswell and had a gun against the back of her head, commented on the fact that there was "an awfully big safe" in the garage. *Id.* at 308. Cole questioned Boswell about the contents of the safe and then asked her for the combination. Cole eventually was able to open the safe. During this time, the women heard sirens approach and then fade. Cole acted calm as if they were expected. Cole then left the house with a bag over his shoulder that contained contents from the garage safe, and the second intruder also left the house with a large bag full of items from Ayers's room. As they were leaving, the intruders told the women to "keep your face on the

4

floor. We're bringing in the K-9s." *Id.* at 346. Boswell estimated that the men were in the home for fifteen to twenty minutes.[9]

After the men left, Boswell was able to free herself from the zip ties and then she helped remove the zip ties from Katina's hands. The two women then left the home and quickly walked to a neighbor's home where police were called. A detective who spoke with Boswell and Katina noted that they each had "little indents and red marks" around their wrists where the zip ties had been used to secure their hands behind their backs. *Id.* at 324. The marks became lighter as time went on. Photographs were taken of the marks approximately six hours after the incident.

After speaking with police, Boswell and Katina were permitted to return to the home and collect some personal belongings. When they went inside, Boswell noted that her step-father's room had been "demolished." *Id.* at 325. No other room in the house had been torn apart in the same manner, even though Boswell's purse was out in the open in her bedroom. Other than the large safe in the garage, little else in the house had been touched.

Meanwhile, Sergeant Louie Koch, a K-9 officer with the Shelby County Sheriff's Department, was on patrol in the area when he came across a stranded vehicle. Sergeant Koch discovered that the car's owner lived nearby, so he went to the owner's residence, going by Ayers's residence on his way. Sergeant Koch learned that the owner of the stranded vehicle was on his way back to fix the car, so Sergeant Koch headed back toward Interstate 74, at which time he encountered a dark SUV stopped in the roadway with its lights

---

[9] On this particular night, there were only two emergency calls to the area: Sergeant Koch's request for assistance in his pursuit of the fleeing vehicle that had been parked outside of Ayers's home, and the

off in front of Ayers's home. The SUV was not in the roadway when Sergeant Koch passed by just minutes earlier. Sergeant Koch activated his emergency lights, but the driver, later identified as LeFlore, drove away with quick acceleration. Sergeant Koch initiated a vehicle pursuit and called for back-up assistance. After a short pursuit, LeFlore stopped the vehicle in the middle of the road and fled from the vehicle, running north into a wooded area. Sergeant Koch found a black ski-mask outside the driver's side door LeFlore had just exited.

Sergeant Koch described the fleeing suspect as a black male wearing a white tank top, and black pants and shoes. Sergeant Koch identified himself as a K-9 officer and ordered LeFlore to stop. After Sergeant Koch lost sight of LeFlore, he returned to the SUV, made sure no one else was inside, and secured it. He then retrieved his K-9 and continued his search for LeFlore. The K-9 followed a "really strong track" along which Sergeant Koch spotted a white tank top in the middle of a field. *Id*. at 408. As his search continued, Koch found a black t-shirt with the word "Police" on it and he advised a crime scene technician as to its location. *Id*. at 409. LeFlore was apprehended later that evening after someone reported seeing a black male was walking down Pumpkin Vine Road. LeFlore was wearing only his undershorts, had smudges of dirt on his back, shoulders, and legs, and his feet were bleeding.

Sheriff Michael Bowlby responded to Sergeant Koch's call for assistance after LeFlore fled in the SUV. As Sheriff Bowlby exited I-74 he observed a black male, later identified as Cole, walking in front of an old convenience store that had closed. Cole was dressed in dark clothing with clearly visible orange or red embroidery on both the shirt and

subsequent report of the home invasion/robbery at Ayers's home.

pants. Given the report that two black men had held two women at gunpoint, Sheriff Bowlby secured Cole while other officers patted him and placed him in handcuffs. Cole was calm, but sweaty despite the cool temperature of that night. Officers found in Cole's pocket seven bundles of folded money, each of them banded together with colored rubber bands and totaling $563. Cole explained to the officers that his car had broken down on the interstate as he was headed to the nearby casino. Sheriff Bowlby searched for a broken-down car as described by Cole and never discovered one and was not aware of anyone else finding a car similar to that described by Cole. During a search of the area, officers discovered a number of items, including ear covers, a black stocking cap, brown work gloves, and a wig behind the convenience store where Cole was apprehended. A shirt marked with "K-9" was found in a nearby yard.

In the days following the incident, additional items were found by private citizens, and police were called to collect the evidence. Pants and boots were found in a nearby barn and a suitcase, safe, and two handguns and a holster were found in another neighbor's yard. The safe contained a large amount of money in bundles of ones, fives, and twenties, totaling $6,832. An eleven-year-old boy found brown gloves and a shirt with "police" written on it in a culvert near his yard. Another neighbor boy found a gun in his yard, which he fired into the air thinking it was a cap gun. The items were submitted to the Indiana State Policy Laboratory for testing. The results of the testing directly linked LeFlore to several items found following the incident (i.e., one of the handguns, a brown glove, and a shirt marked with "Police" that was found in the SUV). The items found behind the convenience store where Cole was apprehended were not submitted for DNA analysis.

7

A search of the SUV from which LeFlore fled revealed a Motorola cell phone with the batteries out, a black bag containing a handgun, ammunition, a Blackberry with the batteries out, and an LG Verizon cell phone with its batteries out. An examination of the Blackberry revealed that it contained pictures of LeFlore and his girlfriend and an entry for "Amp" with the same telephone number that was associated with the Motorola cell phone. Cole was also known as "Amp."

On October 8, 2010, the State charged Cole with burglary, robbery, criminal confinement, intimidation with a deadly weapon, theft, criminal gang activity, and carrying a handgun without a license. The State also included four enhancements to the underlying charges.[10] A jury trial was held May 10-12, 2011, at the conclusion of which the jury found Cole guilty on all counts. Cole then entered into an agreement in which he admitted his status as a habitual offender and the State agreed to dismiss the remaining enhancements. The trial court held a sentencing hearing on June 9, 2011. The trial court sentenced Cole to twenty years for the burglary conviction, twenty years for robbery, twenty years for criminal

---

[10] The enhancements included a habitual offender allegation, carrying a handgun without a license with a prior conviction, carrying a handgun without a license after a felony conviction, and criminal gang activity.

confinement, eight years for intimidation, three years for criminal gang activity, and one year for carrying a handgun without a license, with all of the sentences to run concurrently. The trial court enhanced the burglary sentence by thirty years as a result of Cole's status as a habitual offender, for an aggregate sentence of fifty years.

1.

Cole argues that the evidence is insufficient to support his class D felony conviction for criminal gang activity. Cole's challenge to the sufficiency of the evidence centers on what Cole perceives to be a lack of evidence that he was affiliated with a criminal gang. Our standard of review for challenges to the sufficiency of the evidence is well settled.

> When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Henley v. State,* 881 N.E.2d 639, 652 (Ind. 2008). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id.* We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id.*

*Bailey v. State,* 907 N.E.2d 1003, 1005 (Ind. 2009).

To sustain Cole's conviction for criminal gang activity, the State's evidence must have proved beyond a reasonable doubt that Cole "knowingly or intentionally actively participat[ed] in a criminal gang." *See* I.C. § 35-45-9-3. A "criminal gang" is defined as follows:

> [A] group with at least three (3) members that specifically:
>     (1) either:
>             (A) promotes, sponsors, or assists in; or
>             (B) participates in; or
>     (2) requires as a condition of membership or continued membership;
> the commission of a felony or an act that would be a felony if committed by an adult or the offense of battery (IC 35-42-2-1).

9

I.C. § 35-45-9-1 (West, Westlaw current through 2011 1st Regular Sess.).

Cole asserts without any citation to authority that characterizing what constitutes a criminal gang as "more than two individuals . . . charged as co-defendants in a felony case would surely be contrary to the legislative intent of the statute imposing penalties for gang activity." *Appellant's Brief* at 8. Cole further maintains that the State did not prove beyond a reasonable doubt that more than two individuals were involved on the night in question.

We disagree with Cole on both counts. First, the statute defining what constitutes a criminal gang requires only, as pertinent here, that "a group with a least three (3) members . . . assist[ed] in or participate[d] in the commission of a felony." *See* I.C. 35-45-9-1. The legislative intent is clear from the language of the statute. We will not impose an unwritten requirement that there be proof of formal "gang" affiliation.

Further, the State presented sufficient evidence that Cole knowingly and intentionally participated in a criminal gang by joining with two other men to burglarize, rob, criminally confine, and intimidate Boswell and Katina. Specifically, the State's evidence established that Cole and another (uncharged) individual forced their way into Ayers's home and that they did so with intent to commit a felony. Given the timing of events, it is clear that a third individual, LeFlore, was outside in a getaway vehicle and that he was confronted by and fled from Sergeant Koch while Cole and the second intruder were still engaged in the burglary, robbery, and other related offenses inside Ayers's home. Items found inside the vehicle from which LeFlore fled were similar to and consistent with items used by Cole and the second intruder during the home invasion thus linking LeFlore to the events of the evening.

10

To the extent Cole challenges the evidence as conflicting, we note that "[i]t is the function of the trier of fact to resolve conflicts in testimony and to determine the weight of the evidence and the credibility of the witnesses." *Maxwell v. State*, 731 N.E.2d 459, 462 (Ind. Ct. App. 2000), *trans. denied*. The jury was properly instructed on the elements of the crime of criminal gang activity and what constitutes a criminal gang. The jury was entitled to weigh the State's evidence and could have reasonably inferred that three men were involved on the night in question.

2.

Cole argues that his convictions for burglary, robbery, criminal confinement, intimidation with a deadly weapon, theft, and carrying a handgun without a license violate state double jeopardy principles.

Our Supreme Court has established a two-part test for analyzing state double jeopardy claims. According to that test, multiple offenses are the same offense in violation of article 1, section 14, "if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State,* 717 N.E.2d 32, 49 (Ind. 1999). Cole raises his claim under the actual evidence test. Thus, we must determine whether there is a reasonable possibility that the evidentiary facts used by the jury to establish the essential elements of one offense may also have been used to establish all of the essential elements of the other offense. *See Davis v. State,* 770 N.E.2d 319 (Ind. 2002); *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002) ("the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also

11

establish only one or even several, *but not all,* of the essential elements of a second offense")
(emphasis supplied). In determining what facts were used to support each conviction, we
will consider the evidence, charging information, final jury instructions, and arguments of
counsel. *Rutherford v. State*, 866 N.E.2d 867 (Ind. Ct. App. 2007).

Having reviewed the record, we conclude that Cole is correct that his convictions for
robbery and theft violate double jeopardy principles. The actual evidence relied upon by the
State to support the robbery conviction also establish the essential elements of the theft
conviction. We therefore remand to the trial court with instructions to vacate Cole's
conviction for class D felony theft.[11]

With regard to Cole's remaining convictions, we conclude that the actual evidence
used to support each of them was separate and distinct and therefore, we find no double
jeopardy violations. To be sure, the State relied on testimony that established that Cole
forced his way into Ayers's home with the intent to commit a felony therein. The crime was
elevated to a class A felony because Cole entered Ayers's home while armed with a deadly
weapon (i.e., a handgun) and inflicted bodily injury on Boswell when he used zip ties to
secure her hands behind her back. Cole's intent to commit a felony was clear given that he
entered by subterfuge wearing a mask, and wore clothing that indicated, and acted as if, he

---

[11] The trial court entered a judgment of conviction for theft, but imposed no sentence thereon, finding that it merged with the burglary and robbery convictions.

was a police officer.

The robbery conviction is supported by evidence that Cole took property by force while using a deadly weapon. Specifically, the State presented evidence that Cole held a gun against the back of Boswell's head and demanded the combination to Ayers's safe. Once Cole succeeded in opening the safe, he removed several thousand dollars in cash and at least two handguns.

The criminal confinement conviction was established by evidence that Cole, while armed with a handgun, ordered Boswell and Katina to lie on the floor and then he secured their hands behind their backs with zip ties.

The State proved the intimidation conviction with evidence that Cole communicated a threat to Boswell and Katina when, while armed with a deadly weapon, he ordered them to remain on the floor and not look up as he and the second intruder exited the house. Katina was so frightened that she hoped she would be killed first so that she would not have to experience any harm that might be inflicted upon Boswell (her step-mother).

Contrary to Cole's argument, his conviction for carrying a handgun without a license was not based upon the evidence that he committed several offenses while armed with a deadly weapon. The State relied upon evidence that Cole carried a handgun on his person away from his home or place of business. Cole not only carried his handgun to the crime scene and used it during the commission of the crimes, he also carried it as he left the crime scene. Cole also removed two handguns from Ayers's safe and took them with him when he left.

During closing arguments, the State carefully differentiated between the evidence that

proved the essential elements of the different crimes for which Cole was convicted. Although some of the evidence was used in establishing one or more of the elements of several crimes, in no instance was all of the same evidence used to establish all of the essential elements of two separate crimes. Because each of Cole's convictions was based on different evidentiary facts, his convictions do not violate double jeopardy principles.

3.

Cole challenges the validity of his status as a habitual offender, arguing that it is contrary to law. Specifically, Cole argues that his prior convictions for possession of marijuana do not qualify as prior, unrelated felony offenses capable of supporting his status as a habitual offender.

After the jury returned its guilty verdicts on the underlying offenses, but prior to the start of the second phase of the trial on the matter of Cole's status as a habitual offender and other enhancements, Cole submitted to the court a written document entitled "Agreement on Admission of Habitual Offender Enhancement." *Appellant's Appendix* at 141. In it, Cole admitted to being a habitual offender and the State agreed to dismiss three other enhancements, including carrying a handgun without a license with a prior conviction, carrying a handgun without a license after a felony conviction, and criminal gang activity. The trial court held a guilty-plea-type hearing, advising Cole of his rights and confirming that Cole was knowingly and voluntarily waving his rights. Cole then admitted that he had accumulated two prior, unrelated felony convictions for possession of marijuana or hashish and a prior, unrelated felony conviction for theft.

Cole is challenging the validity of his status as a habitual offender after he pleaded

14

guilty to such enhancement and is not challenging the trial court's exercise of sentencing discretion. In *Tumulty v. State*, 666 N.E.2d 394 (Ind. 1996), our Supreme Court addressed the issue of whether a defendant could directly appeal the trial court's acceptance of a guilty plea to a habitual offender allegation on the ground that such lacked a factual basis. The Court noted that one consequence of pleading guilty is restriction of the ability to challenge the conviction on direct appeal. The Court found this restriction applicable to claims such as that raised by the Tumulty, thus treating a habitual offender adjudication following a guilty plea in the same manner as a conviction. The Court held that the vehicle for relief in such situations is found in Ind. Post-Conviction Rule 1. Because Cole admitted to his status as a habitual offender, his challenge is not subject to review on direct appeal. Cole's argument in this regard is dismissed.[12]

Judgment affirmed in part, reversed in part, dismissed in part, and remanded.

RILEY, J., and MATHIAS, J., concur.

---

[12] Cole's reliance upon *Weiss v. State*, 903 N.E.2d 557 (Ind. Ct. App. 2009), *trans. denied*, is unavailing. The procedural posture of *Weiss* was an appeal following the denial of Weiss's petition for post-conviction relief, not a direct appeal challenge to the validity of his status as a habitual offender following a guilty plea. In this vein, *Weiss* does not conflict with *Tumulty*.