**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 30 2013, 5:19 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GREGORY L. FUMAROLO**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANTHONY EUGENE WINDER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A03-1212-CR-539 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No. 02D05-1109-FA-56

**August 30, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Anthony Winder appeals his conviction of two counts of Robbery Resulting in Serious Bodily Injury,[1] both as class A felonies, and the finding that he is a habitual offender.[2] Winder presents the following restated issues for review:

1. Was the evidence sufficient to support Winder's convictions for robbery and attempted robbery?

2. Did the convictions for robbery and attempted robbery violate the Indiana Constitution's prohibition against double jeopardy?

3. Did the trial court abuse its discretion by allowing the State to add a habitual offender allegation more than a month after the omnibus date?

4. Did the trial court impose an inappropriate sentence?

We affirm in part, reverse in part, and remand with instructions.

The facts favorable to the convictions are that Alex Palermo lives on the property that also is the site of his auto sales business, Palermo Auto Sales. He has a tenant, Tyler Waldrop, who also lives on the property. On September 11, 2011, Palermo returned home at approximately 9:15 p.m. and went to bed. Waldrop was watching television at approximately 11:00 p.m. when he heard the sound of a saws-all cutting metal. Waldrop looked out to the car lot and saw sparks coming out from underneath one of the cars. Waldrop telephoned Palermo and told him what he heard, and Palermo asked him to call 911. Waldrop did so, and informed the 911 operator that someone was trying to steal catalytic converters. Meanwhile, Palermo dressed, armed himself with his 9 mm handgun, and went outside to investigate the sound.

---

1  Ind. Code Ann. § 35-42-5-1 (West, Westlaw current with all 2013 legislation).
2  Ind. Code Ann. § 35-50-2-8 (West, Westlaw current with all 2013 legislation).

Once outside, Palermo saw a small figure standing along a row of cars and walked in that direction. When he got close enough, Palermo observed a woman holding a flashlight. The woman was Winder's twenty-two-year-old daughter, Angela Tate, who was acting as a lookout for Winder while he cut catalytic converters from vehicles on Palermo's lot. When Palermo came close to her, the young woman yelled "Daddy". *Transcript* at 158. At that point, Palermo "felt a thump on [his] left forehead from the side". *Id.* Palermo turned and saw a man, Winder, standing there. Palermo did not know Winder. Palermo tackled Winder and the two began to struggle. Tate struck Palermo on the back of the head with the saws-all, knocking him to the ground. As Winder and Palermo struggled, Winder wrested control of the handgun from Palermo and began punching and smacking Palermo in the head. Palermo eventually was rendered unconscious. When Palermo regained consciousness, there was blood everywhere and he was exhausted. He got up and walked towards his house, where he saw flashing lights and police cars.

Meanwhile, Winder had collected some of his equipment and, armed with Palermo's pistol, ran to a nearby ditch to hide. Officer Donald Kidd of the Fort Wayne Police Department was the first officer to arrive on the scene. He saw Tate walking across the street, pointed her out to fellow officer Ben Messick, and asked him to apprehend her because Officer Kidd heard rustling in some nearby bushes. When Officer Kidd approached the bushes, he saw movement. He drew his Taser and pointed it at the bushes. He ordered whoever was in the bushes to come out with his hands up. Winder walked out of the bushes, but refused the officer's command to get on the ground. At that point, Officer Kidd took

3

Winder to the ground and handcuffed him. Officer Kidd looked in the bushes from which Winder had emerged and discovered "a little black and gray tool bag that had a couple of extra batteries and extra saws-all blades." *Id.* at 281. Police could not find the pistol Winder had taken from Palermo.

Shortly after the incident, Winder contacted Felicia Tate, who was the mother of two of Winder's children, including Angela Tate. Winder told Felicia about his altercation with Palermo and also told her that he had hidden Palermo's gun in the bushes near the ditch. He asked her to retrieve it, but she did not do so. Further investigation at the scene revealed that several vehicles on the lot were missing catalytic converters. Police also discovered several catalytic converters that had recently been cut off of vehicles lying in the bed of a pickup truck parked on the lot.

The State ultimately charged Winder with robbery as A class a felony, battery as a class C felony, attempted theft as a class D felony, and attempted robbery as a class A felony. The State also filed a habitual offender allegation. The robbery charge was based upon the taking of Palermo's handgun, whereas the attempted-theft charge was based upon Winder's attempt to take the catalytic converters. The State dismissed the battery and attempted theft charges before trial. Following a jury trial, Winder was convicted of the remaining charges and found to be a habitual offender.

## 1.

Winder contends the evidence was not sufficient to support his convictions for robbery and attempted robbery. Specifically, Winder contends there is insufficient evidence

to prove the "force" element of robbery, i.e., that the physical assault was undertaken with the intent to take Palermo's gun. Also, he contends the physical altercation with Palermo was not undertaken in an attempt to complete the taking of the catalytic converters.

Our standard of reviewing challenges to the sufficiency of the evidence supporting a criminal conviction is well settled.

> When reviewing a challenge to the sufficiency of the evidence underlying a criminal conviction, we neither reweigh the evidence nor assess the credibility of witnesses. The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction. "[W]e affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Davis v. State,* 813 N.E.2d 1176, 1178 (Ind. 2004). A conviction can be sustained on only the uncorroborated testimony of a single witness, even when that witness is the victim.

*Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012) (some citations omitted).

To convict Winder of robbery as charged, the State was required to prove that Winder knowingly or intentionally took property from the person or presence of Palermo by using or threatening the use of force, and that Winder's actions resulted in serious bodily injury to Palermo. I.C. § 35-42-5-1. In essence, Winder claims that the initial struggle with Palermo was undertaken in defense of his daughter and not undertaken with the intent to take either the gun or the catalytic converters from Palermo.

In *Coleman v. State,* 653 N.E.2d 481 (Ind. 1995), the defendant entered a grocery store, went to a video rental counter, and pocketed five rolls of film. As the defendant was leaving the store, a customer who had observed Coleman's action alerted store personnel. One of the store's manager's confronted Coleman outside of the store and asked if he had

5

forgotten to pay for anything. Coleman then pulled a knife and threatened the manager, whereupon the manager retreated back inside the store. Coleman was later arrested, tried, and convicted of robbery. Upon appeal, Coleman argued that he did not put the store manager in fear before or during the taking of the property, and that he had completed the taking before he was confronted outside the store. Accordingly, he argued, the evidence was not sufficient to prove that he took the film while using force and therefore not sufficient to sustain a conviction for robbery. Our Supreme Court affirmed the conviction, holding that the defendant "was only successful in removing the items from the premises and from [the manager's] presence by threatening him with the knife." *Id.* at 483. In so holding, the Supreme Court noted "that a 'taking' is not fully effectuated if the person in lawful possession of the property resists before the thief has removed the property from the premises or from the person's presence." *Id.* at 482.

In the present case, Winder does not dispute that an altercation occurred between him and Palermo. But, he contends, his intention in fighting with Palermo was to protect his daughter. As indicated above, the trial court was not required to believe that claim. There was evidence that Winder took Palermo's gun from him during a physical altercation between the two. The evidence permits a reasonable inference that Winder forcibly wrested the gun away from Palermo and fled with it, but not before pummeling Palermo to the point of unconsciousness. Therefore, the evidence was sufficient to sustain the conviction for robbery based upon the taking of Palermo's handgun.

Winder offers a similar argument in challenging his conviction of attempted robbery.

6

That is, he contends "that the physical altercation with Palermo was not done in an attempt to complete the taking of the catalytic converters." *Appellant's Brief* at 10. This argument suffers the same fatal flaw as the argument pertaining to the robbery conviction. As indicated in *Coleman*, a taking is not fully effectuated until the property in question is removed from the owner's premises or presence. Palermo confronted Winder while Winder was still on Palermo's property and, indeed, at about the same time Winder was in the process of cutting off one of the catalytic converters. Any force exerted by Winder against Palermo in furtherance of this criminal endeavor before Winder effectuated his escape, i.e., removed the catalytic converters from Palermo's property or from Palermo's presence, constitutes "force" within the meaning of I.C. § 35-42-5-1. *See Coleman v. State,* 653 N.E.2d 481; *see also Young v. State*, 725 N.E.2d 78, 81 (Ind. Ct. App. 2000) (the defendant took money from the victim and fled, with the victim giving chase; the victim was later injured when the defendant ran over the victim's leg with a car while effectuating his escape; the Supreme Court rejected the argument that the taking was complete when the defendant exerted force, reasoning that "the snatching of money, exertion of force, and escape were so closely connected in time…, place…, and continuity…, that… [the] taking of property includes [the defendant's] actions in effecting his escape"). The evidence was sufficient to support both convictions.

2.

Winder contends that under the "actual evidence test", the "single larceny rule", or the "continuous crime doctrine", his convictions of both robbery and attempted robbery violate

7

the Indiana Constitution's prohibition against double jeopardy. A trial court's legal conclusions concerning whether convictions violate double jeopardy prohibitions are reviewed de novo. *Sloan v. State*, 947 N.E.2d 917 (Ind. 2011).

We begin with Winder's claim that his convictions of both robbery and attempted robbery violate double jeopardy under the single larceny rule. Our Supreme Court has described the "single larceny rule" as follows: "[W]hen several articles of property are taken from the same person at the same time, from the same place, there is but a single larceny for which there may be but one judgment and one sentence." *Johnson v. State*, 749 N.E.2d 1103, 1110 (Ind. 2001) (quoting *Tingle v. State,* 632 N.E.2d 345, 350 (Ind. 1994)). The underlying rationale is that the taking of several articles at the same time from the same place is undertaken pursuant to a single intent and design. Accordingly, because only one offense has been committed, there may be only one judgment and one sentence. *J.R. v. State*, 982 N.E.2d 1037 (Ind. Ct. App. 2013), *trans. denied*. Our Supreme Court has indicated that our focus in reviewing these claims should be upon whether "the offenses to be prosecuted and punished are the same, and not whether the offenses spring from the same act or operative circumstances. .... The ultimate focus is on the identity of the offenses, not on the identity of their source." *Id.* at 1039 (quoting *Elmore v. State,* 269 Ind. 532, 539, 382 N.E.2d 893, 897 (1978), *abrogated on other grounds by Richardson v. State,* 717 N.E.2d 32 (Ind. 1999)).

Winder entered onto Palermo's property with the intent to steal catalytic converters from automobiles owned by Palermo's business. The theft of Palermo's gun resulted from the physical altercation that ensued after Palermo discovered and confronted Winder in the

process of stealing catalytic converters. Winder stole the gun in the process of his escape. Therefore, it cannot be said that the theft of the gun was a part of Winder's intent and design to steal the catalytic converters.

Moreover, the single larceny rule does not apply where a perpetrator takes property from two separate people or entities. In *McKinley v. State*, 272 Ind. 689, 400 N.E.2d 1378 (1980), the defendant entered a pharmacy and ordered the cashier to give him the contents of the cash register. The defendant then took the wallet and watch of the pharmacy's owner. He was subsequently convicted of two counts of robbery, one for taking the store's money and one for taking the owner's personal property. The defendant appealed, arguing that the two constituted only one robbery under the single larceny doctrine. Our Supreme Court affirmed the convictions, explaining:

> The Norwaldo Pharmacy is a business establishment. The robbery of that business in the case at bar constituted one count of armed robbery. This is not a case in which a defendant robbed an individual of various belongings in a personal setting. Rather, petitioner robbed a business, an impersonal setting to anyone other than a regular customer. When petitioner relieved the store owner of his personal wristwatch and wallet, his actions took on a different character. ... We do not find that "stripped down to the basic reality" the robbery of the pharmacy and Herman Steinkeler "constituted a unitary transaction."

*Id*. at 1379 (quoting *United States v. Hopkins*, 464 F.2d 816, 823 (D.C. Cir. 1972)). The same rationale applies in the present case. Winder attempted to take property (the catalytic converters) from Palermo's business. In addition, he took personal property (the gun) from Palermo. Those two actions support separate robbery charges.

Winder contends his convictions of both robbery and attempted robbery violate Indiana's double jeopardy prohibition pursuant to the "continuous crime doctrine." "The

9

continuing crime doctrine essentially provides that actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Walker v. State*, 932 N.E.2d 733, 735 (Ind. Ct. App. 2010). Winder attempted to take catalytic converters from Palermo's business. In furtherance of that endeavor, he crawled under several vehicles and cut the catalytic converters off of the vehicles and then placed them in the bed of a pickup truck. He did this primarily while Palermo was absent. On the other hand, the robbery conviction was based upon Winder's forcible taking of Palermo's handgun from Palermo's person during the struggle that ensued after Palermo arrived on the scene. This offense was sufficiently distinct from the first offense so that the continuous crime doctrine does not prevent conviction of both as separate offenses.

Finally, Winder contends that his conviction of both attempted robbery and robbery run afoul of the Indiana Constitution's double jeopardy prohibition pursuant to the "actual evidence test." Double jeopardy claims of this kind that arise under the Indiana Constitution are evaluated utilizing a two-part test, pursuant to which multiple offenses are the same offense in violation of article 1, section 14, "if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State,* 717 N.E.2d at 49. To prevail under the actual evidence test, Winder must demonstrate that there is a reasonable possibility that the evidentiary facts used by the jury to establish the essential elements of one his offenses may also have been used to

establish all of the essential elements of the other. *See Davis v. State,* 770 N.E.2d 319 (Ind. 2002); *Spivey v. State,* 761 N.E.2d 831, 833 (Ind. 2002) ("the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, *but not all,* of the essential elements of a second offense") (emphasis supplied). In applying the actual evidence test, we must "identify the essential elements of each of the challenged crimes and … evaluate the evidence from the jury's perspective." *Lee v. State,* 892 N.E.2d 1231, 1234 (Ind. 2008) (quoting *Spivey v. State,* 761 N.E.2d at 832). The "reasonable possibility" standard "requires substantially more than a logical possibility" and "turns on a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions." *Id.* at 1236. "In determining what facts were used to support each conviction, we will consider the evidence, charging information, final jury instructions, and arguments of counsel." *Cole v. State*, 967 N.E.2d 1044, 1050-51 (Ind. Ct. App. 2012).

The charging information pertaining to Winder's robbery conviction (Count I) stated, in relevant part:

> On or about the eleventh day of September, 2011, in the County of Allen and in the State of Indiana, said defendant, Anthony Eugene Winder, did knowingly or intentionally take property, to wit: a firearm; from the person or presence of another person, to wit: Alex Palermo, by using or threatening the use of force or by putting said Alex Palermo in fear, said act resulting in serious bodily injury to Alex Palermo[.]

*Appellant's Appendix* at 15. The charging information for attempted robbery (Count IV) stated, in relevant part:

> On or about the eleventh day of September, 2011, in the County of Allen and

11

in the State of Indiana, said defendant, Anthony Eugene Winder, did attempt to commit the crime of Robbery, to wit: with intent to take property, to wit: catalytic converters, from the person or presence of another person, to wit: Alex Palermo, by using or threatening the use of force or by putting said Alex Palermo in fear, said Defendant did attempt to remove catalytic converters from vehicles and used force to try to complete the taking of property, said conduct constituting a substantial step toward the commission of the crime of robbery, said act resulting in serious bodily injury to Alex Palermo [.]

*Id.* at 28. The two charging informations clearly set out separate and distinct acts. Under Count I, Winder was alleged to have taken a firearm from Palermo's person. Under Count IV, Winder was alleged to have attempted to remove catalytic converters from Palermo's business's vehicles. The evidence demonstrated that Winder cut catalytic converters off of several vehicles and placed them in the bed of a pickup truck. When he was finished or nearly finished cutting off another one, Palermo appeared on the scene. The two struggled, with Winder gaining the upper hand and, with Angela Tate's assistance, rendering Palermo unconscious. We conclude there is no reasonable possibility that the jury could have "latched on to exactly the same facts for both convictions." *Lee v. State,* 892 N.E.2d at 1236. Moreover, the two counts involved different victims, as explained above. Conviction of both did not violate double jeopardy under the Indiana Constitution pursuant to the actual evidence test.

Although we have concluded that conviction of both robbery and attempted robbery does not violate double jeopardy, the State concedes that one of Winder's convictions must be reduced from a class A felony to a class C felony. This is because both counts were impermissibly elevated to class A felony status based upon the same serious bodily injury. *See Carrico v. State*, 775 N.E.2d 312, 320 (Ind. 2002) ("[e]nhancement of one offense for the

12

very same harm as another is not permissible"). When this occurs, the remedy is to reduce one of the offenses to a classification that does not include any element of bodily injury. *See Strong v. State*, 870 N.E.2d 442 (Ind. 2007). In the present case, this means that the attempted robbery conviction must be reduced to a class C felony.

3.

Winder's omnibus date was November 7, 2011. On December 15, 2011, the State filed its notice of intention to seek a habitual offender enhancement. Winder contends the trial court abused its discretion by allowing the State to proceed with the habitual offender allegation because the foregoing notice was filed more than a month after the omnibus date. Pursuant to the version of Ind. Code Ann. § 35-34-1-5(e) in effect at the time Winder committed his offenses,[3] an amendment to a charging information that includes a habitual offender enhancement "must be made not later than ten (10) days after the omnibus date." That provision also provided, however, that "[u]pon a showing of good cause … the court may permit the filing of an habitual offender charge at any time before the commencement of the trial." *Id*. Winder contends that because the trial court did not enter a finding of "good

---

[3] In *Fields v. State*, 888 N.E.2d 304 (Ind. Ct. App. 2008), this court held that the version of I.C. § 35-34-1-5 in effect at the time the defendant committed the underlying offense applies. I.C. § 35-34-1-5(e) was amended, effective July 1, 2013, to read as follows:

> An amendment of an indictment or information to include a habitual offender charge under IC 35-50-2-8, IC 35-50-2-8.5, or IC 35-50-2-10 must be made at least thirty (30) days before the commencement of trial. However, upon a showing of good cause, the court may permit the filing of a habitual offender charge at any time before the commencement of the trial if the amendment does not prejudice the substantial rights of the defendant. If the court permits the filing of a habitual offender charge less than thirty (30) days before the commencement of trial, the court shall grant a continuance at the request of the:
> (1) state, for good cause shown; or
> (2) defendant, for any reason.

13

cause", it erred in permitting the State to amend the charging information and to include the habitual offender allegation.

At a December 15, 2011 hearing, the parties discussed the State's pending notice of intention to file habitual offender enhancement. At that hearing, Winder argued that the amendment should not be allowed because the time for filing under I.C. § 35-34-1-5(e) had passed. The State responded that during the relevant time period, the State and Winder had engaged in negotiations for a plea agreement. The State extended a plea agreement offer to Winder in which it agreed not to file a habitual offender count if Winder accepted the offer. The State informed the attorney representing Winder at the time that it preserved its ability to file a habitual offender count in the event that the plea negotiations were unsuccessful. Ultimately, no agreement was reached.

In *Land v. State*, 802 N.E.2d 45 (Ind. Ct. App. 2004), *trans. denied*, this court determined that the trial court did not abuse its discretion in finding good cause under I.C. § 35-34-1-5(e) where the State delayed in filing a habitual offender count during the pendency of plea negotiations in which the State's offer included not filing a habitual offender count. The situation in that case is practically indistinguishable from the present case. There, as here, the State delayed in filing the habitual offender count because that count was "on the table" during the bargaining process. Moreover, in *Land*, it appears that the trial court did not enter a specific finding of good cause. *See id.* at 53 ("[b]y permitting the State to file the habitual offender count, the trial court *impliedly* found good cause") (emphasis supplied). Pursuant to *Land*, the trial court did not abuse its discretion in impliedly finding good cause

to permit the filing as a result of the plea negotiations between Winder and the State.

Lastly, even assuming for the sake of argument that the trial court's finding was in error, Winder has failed to demonstrate that he was prejudiced by the late filing of the habitual offender count. Winder was apprised of the State's intention to add a habitual offender count in December 2011. This was approximately ten months before the trial in this cause. The *Land* panel found a period of approximately six months sufficient to preclude a presumption of prejudice. Like the defendant in *Land*, Winder offers no explanation of how he was prejudiced by the timing of the habitual offender count, or indeed even make a claim that he was prejudiced at all. The trial court did not abuse its discretion in permitting the State to add a habitual offender count more than ten days after the omnibus date.

4.

We begin our review of Winder's sentence by noting that the trial court found that the sentencing factors warranted the imposition of the maximum sentence for each of the class A felonies of which Winder was originally convicted. Accordingly, we conclude that for his revised conviction of class C felony robbery, as discussed above, the trial court would impose the maximum authorized sentence, i.e., eight years, to be served concurrently with the fifty-year sentence imposed for the robbery conviction. *See Strong v. State*, 870 N.E.2d 442.

In addition, the State directs our attention to an error concerning the habitual offender enhancement. The trial court imposed the maximum sentence of fifty years for each of Winder's class A felony convictions (i.e., Counts I and IV) and ordered that those sentences were to be served concurrently. The court imposed a habitual offender enhancement of thirty

15

years, which it specified enhanced *both* Counts I and IV. "In the event of simultaneous multiple felony convictions and a finding of habitual offender status, trial courts must impose the resulting penalty enhancement upon only one of the convictions and must specify the conviction to be so enhanced." *Greer v. State*, 680 N.E.2d 526, 527 (Ind. 1997). Therefore, the trial court erred in enhancing both sentences.

Winder contends we should remand with instructions to resentence. We decline to remand to the trial court for the purpose of specifying which sentence is to be enhanced, because we think it clear that the trial court would impose the habitual offender enhancement on the sentence for the class A felony robbery conviction, rather than on the class C felony attempted robbery conviction. We will proceed with a review of the appropriateness of Winder's sentence with these revisions in mind.

Winder contends his sentence was inappropriate in light of his character and the nature of his offense. Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences. Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task. *Cardwell v. State*, 895 N.E.2d 1219 (Ind. 2008). Per Indiana Appellate Rule 7(B), we may revise a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Wilkes v. State*, 917 N.E.2d 675, 693 (Ind. 2009), *cert. denied*, 131 S.Ct. 414 (2010). "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d at 1223. Winder bears the burden on

16

appeal of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073 (Ind. 2006).

The determination of whether we regard a sentence as appropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State,* 895 N.E.2d at 1224. Moreover, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Id.* at 1225. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original).

In order to assess the appropriateness of a sentence, we first look to the statutory ranges established for the classification of the relevant offenses. Winder was convicted of two class A felonies – robbery and attempted robbery. As we have indicated, however, the attempted robbery conviction must be reduced to a class C felony. The advisory sentence for a class A felony is thirty years; the maximum sentence is fifty years. The advisory sentence for a class C felony is four years; the maximum sentence is eight years. In addition, Winder's sentence for robbery is enhanced by thirty years based upon his habitual offender status. Therefore, Winder received an executed sentence totaling eighty years.

With respect to the nature of the offense, Winder contends that he did not

17

"contemplate that Palermo would interrupt the theft armed with a handgun." *Appellant's Appendix* at 25. After observing that Palermo "could have held them at gunpoint until the police arrived", he contends that Palermo "ran at Winder armed with the weapon". *Id.* He continues that, "it was only after again gaining an advantage over Winder that Winder's daughter hit Palermo from behind, inflicting the injuries on Palermo." *Id.* at 25-26. Clearly, Winder seeks to place some of the blame for Palermo's injuries upon Palermo himself. Among other things, we observe that this line of reasoning is premised upon crediting Winder's version of what happened during the occurrence. That version is at odds with Palermo's. The trial court was not required to believe that the events unfolded as Winder claimed they did. Neither are we. This argument, weak as it is, is entirely unpersuasive in light of Palermo's account of the occurrence. The facts are that while on his own property, Palermo was struck viciously by a heavy, blunt object and suffered serious injuries as a result, including a depressed skull fracture that has significantly impacted his life to this point, and will continue to do so in the future.

Turning now to Winder's character, Winder's presentence investigation report reflects a significant criminal history. Beginning with a juvenile proceeding against him for shoplifting, and continuing largely unabated ever since, Winder has accumulated two true findings of juvenile delinquency, eight misdemeanor convictions, and five felony convictions. The misdemeanor convictions include a conviction for battery. The felony convictions include three convictions of robbery and one firearms offense. Winder was evaluated in conjunction with his presentence investigation report pursuant to the Indiana

Risk Assessment System. He was rated as a "very high risk" to reoffend. *Id*. at 122. Thus, it is not surprising that he indicated to the probation department that he "does not have a plan to abstain from trouble, as he is 'about to get 80 years and spend the rest of his life in prison.'" *Id.* at 120. Finally we note that he has violated probation on one previous occasion, and was on probation when he committed the present offenses.

The picture that emerges is that of a person who is either unwilling or incapable of conforming his behavior to live within the boundaries of the law. Indeed, he seems to openly acknowledge his disregard for the rules of society. Viewed in this light, the lengthy sentence, revised along the lines set out above, is justifiable as necessary to protect society from Winder's criminal proclivities and therefore is not inappropriate.

This matter is remanded to the trial court with instructions to reduce the attempted robbery conviction to a class C felony and correct the sentencing order along the lines discussed previously in this opinion.

Judgment affirmed in part, reversed in part, and remanded with instructions.

BAKER, J., and VAIDIK, J., concur.