FILED

Jul 24 2019, 8:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Jon A. Keyes
Allen Wellman McNew Harvey, LLP
Greenfield, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jonathan Rivera, *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff*. | July 24, 2019 <br><br> Court of Appeals Case No. 18A-CR-3108 <br><br> Appeal from the Hancock Circuit Court <br><br> The Honorable Cody B. Coombs, Court Commissioner <br><br> The Honorable Scott Sirk, Judge <br><br> Trial Court Cause No. 30C01-1712-F4-2635 |

**Brown, Judge.**

[1] Jonathan Rivera appeals his conviction and sentence for attempted child molesting as a level 4 felony. Rivera raises two issues which we revise and restate as:

    I. Whether the admission of certain testimony resulted in fundamental error; and

    II. Whether his sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

[2] In July 2016, Rivera met Na.M. online. At some point, Rivera and Na.M. "really wanted to be in each other's lives" and he planned to visit her for three weeks. Transcript Volume II at 14. In September 2016, he flew from New Jersey and stayed in her two-bedroom apartment in Beech Grove, Indiana, where she resided with her son, S.M., and twin daughters, N.M. and E.M., who were around eight years old.[1]

[3] Rivera gained the trust of N.M. and E.M., talked to and played with them at the playground or outside, and "rough housed a little bit like wrestling" which, because N.M. and E.M. loved wrestling, they thought "was always a cool thing." *Id.* at 15. During this trip, he stayed with Na.M. in the bedroom she shared with the girls, and the girls slept on the bed in the living room. Upon

---

[1] At trial in July 2018, Na.M. testified that N.M. and E.M. were ten years old.

returning to New Jersey, he spent more time talking to the girls and spoke with them over the telephone "just about every day" in October and November 2016, "always mak[ing] sure he talked to them before bed." *Id.* at 17. In saying goodnight, Rivera would state "go to sleep love you guys." *Id.*

[4] By mutual agreement of Rivera and Na.M., he returned to Beech Grove on December 5, 2016, for an open-ended stay. In January, Rivera became "a totally different person" according to Na.M., and their sex life became nonexistent. *Id.* at 19. During the time he pulled away from Na.M., Rivera spent more time interacting with N.M. and E.M. and played and watched movies with them. At some point, he had a discussion with the girls and, without Na.M., they made the decision that he should return to New Jersey at the end of February.

[5] A couple of weeks before he left, Na.M. approached Rivera and attempted to break up with him. He "kind of flipped it on [Na.M.] like [she] was in the wrong," walked away, and then later that day acted like nothing had happened. *Id.* They continued to speak when he returned to New Jersey and decided at some point he would return to Indiana permanently. When they found out that Rivera was going to move in with them permanently, N.M. and E.M. were happy. In June 2017, Na.M. and the girls traveled to New Jersey and stayed for two days to attend the wedding of Rivera's mother, and Rivera returned to Indiana with them.

[6] During that summer, shortly after he moved to Indiana, Rivera and Na.M., along with S.M., N.M., and E.M., attended family gatherings at the house of Na.M.'s brother in McCordsville, where they barbequed and drank alcoholic beverages. N.M. slept with E.M. and two male cousins in the loft and, because the affection "was just about gone" between Na.M. and Rivera and there was "no point in going to a bedroom together," they slept on different parts of a sectional couch. *Id.* at 26.

[7] On one such visit, N.M. lay down on the small couch in the loft and went to sleep wearing her regular clothes. She woke to Rivera sleeping with her. He had somehow positioned himself underneath her with her back on his stomach, and his hands were underneath her pants. Rivera placed "his hand closer and closer" and reached "[l]ike half way" to where her "legs . . . attach[ed] to kind of [her] stomach torso area." *Id.* at 55. She pulled his hand out, moved around, told him to stop, and said "no, no, and no." *Id.* at 52. He "[j]ust kept trying," kept asking "please, please," and at some point stopped. *Id.* at 52, 55.

[8] Sometime in August or September, Na.M. and Rivera's relationship failed, he returned home in September because his father was not doing very well and "his Mom had some issues going on and he had to hurry up and go back," and Na.M. stuck a letter in his luggage explaining that "things were not working out." *Id.* at 28-29. After some time had passed, she let him know she and the children had moved and that they had found a few of his things, and he responded by telling her to throw them away. At some point, he told her that he hoped she found somebody that "was going to mistreat [her] and [her] kids."

*Id.* at 29. Two weeks after he left, Na.M. became concerned after a mutual friend of her and Rivera's received a text from him, she asked N.M. if Rivera had ever touched her, and N.M. said yes. Na.M. contacted the police, who investigated the allegation.

[9] On December 21, 2017, the State charged Rivera with one count of attempted child molesting as a level 4 felony. On June 28, 2018, Rivera waived his right to a jury trial and, on July 9, 2018, the court held a bench trial. When asked how many times she spoke to Rivera over Whatsapp after meeting him, Na.M. responded that they spoke to each other almost every single day. She testified that he knew she had two daughters and their ages, and when asked if he said anything about her having two young girls, she responded, "Just that usually whoever he dates usually has daughters." Transcript Volume II at 14. She responded affirmatively when asked if Rivera assumed a father-figure role while in the house with her, the girls, and S.M. She indicated that, when Rivera moved in after his mother's wedding, she and he shared a bed and the girls had bunkbeds in the room as well.

[10] When asked to describe the loft area and furniture at the McCordsville house, Na.M. stated that there was a "large couch and a smaller couch uh the coffee table right here." *Id.* at 27. After indicating that she had a concern and that she asked N.M. if Rivera ever touched her, the following exchange occurred:

> Q And what then did you ask your daughter?

A I after I saw that um I asked [N.M.] to come and sit by me and I she's like what's up Mom and then I asked her if Jonathan ever touched her and she bowed her head and said yes.

Q Okay. I'm going to stop you right there um because that will get into some hearsay and [N.M.'s] here to testify but . . .

\* \* \* \* \*

Q [A]nd so uh when the disclosure was made to you that something had happened what did you do?

A Um of course I asked her detail I wanted to know what had happened after that I had called [E.M.] and I asked her the exact same thing her reaction was the exact same way um and then she told me what happened. After I talked to them I asked them both, what they wanted me to do, do you want to make a police report or do you want me to let it go? I can let it go and act like it never happened and we'll be fine or let's press charges and hope that he never gets to do this to somebody else.

Q And um so I think you said you ask [N.M.] first?

A [Y]es.

Q And then you asked [E.M.] correct?

A Yes.

Q And [N.M.] disclosed something, did [E.M.] disclose anything?

A Yes.

Q Okay. Um with what [E.M.] disclosed was this the same type of touching or did something different?

*Id.* at 32-33. Rivera's counsel objected on the grounds that "this is indirectly testimony of a child" who was not on the witness list and not alleged to be a

victim, and the State withdrew its question. *Id.* at 33. When later asked if when N.M. "disclosed it did you do you know where it occurred at," Na.M. stated "[s]he told me it occurred at my brother's house." *Id.* at 34.

[11] N.M. testified that she remembered telling Na.M. that something had happened up in the loft. She stated that it had happened at her uncle's house and, in sharing what she told her mother, indicated that she told Na.M. about Rivera touching her when they moved from Beech Grove into a trailer park and that they were talking alone and "she asked me has [Rivera] ever touched me and I told her yes. And I told her the story." *Id.* at 52. In describing the incident, she stated that she was going to bed, "we were watching a movie," and that "then [she] woke up" and found Rivera's hand down her pants. *Id.* She indicated she was scared when asked what she did after he left the room and that there were other children sleeping in the loft area when the incident happened. She answered affirmatively when asked if she recalled whether she had panties on and stated "[y]es" when asked if Rivera was "going underneath [her] panties or just [her] pants" and "[k]ind of" when asked if he was touching her bare skin. *Id.* at 53. When asked where she would describe that Rivera was touching her, she answered "[o]n top of my private part. Um he didn't fully touch me but like he half way did." *Id.* She stated that she "pulled his hand out, moved around, told him to stop, said no." *Id.* at 55. She said that "[h]e would kiss me like a big girl" and "[w]hen he would kiss me around when my Mom like was around me and like when she'd put me in bed then he would give me like a sweetheart kiss it was like maybe on the forehead or a cheek but then when

she's not around he would kiss me like a big girl." *Id.* at 60. In describing the "big girl kiss," she stated, "Not like a kids kiss like if you're like someone you loved them so much that's how like he would kiss me" and answered affirmatively when asked if it was "a lip to lip type kiss." *Id.*

[12] Rivera testified that he wanted to be a father figure to the girls and that he thought a father figure was "supposed to . . . give attention to not only . . . the partner but also to the kids." *Id.* at 84. He indicated he was not aware at first about Na.M.'s letter and explained "I was busy working doing landscaping" and "doing what I had to do to make ends meet" so that he could pay his "backed up bills" in New Jersey. *Id.* at 82. During cross-examination, he stated that "if there was kissing on the lips [Na.M.] allowed them to kiss me on the lips," and when asked if he did in fact kiss the girls, that "[i]t would be a yes and a no. Yes there was some kissing on the lips but no it was not like a big girl as she described." *Id.* at 84. After indicating that he decided to move to Indiana because of a promise of work by Na.M., the State asked "[t]hat's rather interested, [sic] aren't you on disability," and he stated "[y]es but I could still work." *Id.* at 86-87. The following exhange occurred:

> Q [Y]ou're not supposed to be working correct?
>
> A No, no.
>
> Q Did you report your earnings from all of your landscaping work that you were doing in New Jersey?
>
> A Well I was really just helping out my brother cause he don't speak English so I was basically translating for him and doing contracts for him for the jobs.

Q But you just stated earlier when counsel asked you that you were trying to work all your business up it was really busy trying to close it down before uh the holidays, before you came back?

A Yeah because my brother was trying to do all the things by himself. Like I said he don't speak any English I had to translate everything for him, write down all the contracts, so yes that made it pretty busy for me as well because I was helping I'm helping him translate everything from English to Spanish so he could do what he got to do plus taking him to the addresses and helping him with the English speaking clients that he had.

Q And so you came here to work?

A Yes.

Q Landscaping away from your brother while you are collecting a disability check correct?

A Yes.

Q Isn't that somehow dishonest?

A Well I got to make I've got to do something to keep myself busy. I can't sit around waiting for a disability check all month long, because I only get in New Jersey . . . $785.00 which is basically my rent my bills plus my phone bill plus pay any dues . . . .

*Id.* at 87-88. The court found Rivera guilty as charged. Na.M. testified at the sentencing hearing that it has "been a tough road because [N.M.] doesn't understand why he did this in the first place or why he chose her," that N.M. was very angry about the whole situation, and that she was seeking services for N.M. as a result of Rivera's actions and counseling for herself. *Id.* at 107. The court sentenced him to eight years with six years executed and two years suspended to sex offender specific probation.

*Discussion*

I.

[13] The first issue is whether the admission of certain testimony resulted in fundamental error. We note that Rivera did not object at trial to the testimony he challenges on appeal and, to the extent that he challenges it now, we review it for fundamental error.[2] *See Whatley v. State*, 908 N.E.2d 276, 280 (Ind. Ct. App. 2009), *trans. denied*. To rise to the level of fundamental error, an error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Id.* (citing *Maul v. State*, 731 N.E.2d 438, 440 (Ind. 2000)). "The standard for fundamental error is whether the error was so prejudicial to the rights of the defendant that a fair trial was impossible." *Id.* (citing *Boatright v. State*, 759 N.E.2d 1038, 1042 (Ind. 2001)).

[14] Rivera contends that the admission of testimony by Na.M. that E.M. had also made allegations against him constituted inadmissible hearsay evidence and violated his right to confrontation and that E.M.'s allegations destroyed his credibility, were not relevant, and that the danger of undue prejudice outweighed their probative value. He contends the admission of testimony by Na.M. regarding N.M.'s allegations constituted forbidden drumbeat testimony

---

[2] We obseve that Rivera did not object to the testimony he challenges except for the State's withdrawn question of "with what [E.M.] disclosed was this the same type of touching or did something different." Transcript Volume II at 33.

because Na.M. was allowed to repeat portions of N.M.'s allegations before she testified. He asserts that in such "a He Said/She Said case" which "turns solely on a single witness like N.M., forbidden drumbeat testimony is particulary prejudicial." Appellant's Brief at 16. He further argues that the State's entire line of questioning regarding his disability and income reporting was irrelevant and its sole purpose "was to elicit testimony about uncharged supposed wrongs to make [him] appear dishonest." *Id.* at 18.

The State contends that the challenged evidence "amounted only to":

> (1) testimony of a non-descript uncharged disclosure made by [Na.M.'s] second daughter[, E.M.]; (2) testimony that N.M. confirmed to [Na.M.] that she had been "touched" by Rivera and that the touching happened at the home of [Na.M.'s] brother; and (3) impeachment testimony about whether Rivera's work as a landscaper was "dishonest."

Appellee's Brief at 17.

Ind. Code § 35-42-4-3(b) provides that a person who, with a child under fourteen years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person, commits child molesting, a level 4 felony.

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Ind.

Evidence Rule 801(c).  Ind. Evidence Rule 802 provides that hearsay is "inadmissible unless admitted pursuant to a recognized exception."

[18]  Ind. Evidence Rule 401 provides that evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action.  Ind. Evidence Rule 402 provides that "[i]rrelevant evidence is not admissible."  Ind. Evidence Rule 403 permits the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."  Ind. Evidence Rule 404(b) provides in part:

> Evidence of a crime, wrongs, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

In assessing the admissibility of evidence under Ind. Evidence Rule 404(b), the trial court must: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Ind. Evidence Rule 403.  *See Kyle v. State*, 54 N.E.3d 439, 444 (Ind. Ct. App. 2016) (citing *Ware v. State*, 816 N.E.2d 1167, 1175 (Ind. Ct. App. 2004)).  A trial court's evidentiary rulings are presumptively correct, and the "defendant bears the burden on appeal of

persuading us that the court erred in weighing prejudice and probative value under Evid. R. 403." *Anderson v. State*, 681 N.E.2d 703, 706 (Ind. 1997). The determination of whether there is a risk of unfair prejudice depends on "the capacity of the evidence to persuade by illegitimate means, or the tendency of the evidence to suggest decision on an improper basis." *Camm v. State*, 908 N.E.2d 215, 224 (Ind. 2009) (quoting *Ingram v. State*, 715 N.E.2d 405, 407 (Ind. 1999)).

[19] The record reveals that Rivera did not object when Na.M. testified that, after a disclosure that something had happened, she asked N.M. for details and after that "called [E.M.] and . . . asked her the exact same thing her reaction was the exact same way um and then she told me what happened." Transcript Volume II at 32. He did not object when she answered affirmatively to questions of whether she had asked N.M. first and "then . . . asked [E.M.] correct" and whether N.M. "disclosed something, did [E.M.] disclose anything." *Id.* at 33. When Rivera did object to an inquiry about E.M.'s disclosure, the State withdrew the question. With respect to the testimony about N.M.'s allegations, Rivera did not object when Na.M. indicated that N.M. answered affirmatively when she asked if Rivera ever touched her and that N.M. shared that the touching occurred at the house of Na.M.'s brother. We note that this was a bench trial and cannot say that any error in the admission of Na.M.'s statements denied Rivera of fundamental due process.

[20] With respect to Rivera's testimony about disability, we note that he testified during direct examination that he worked and landscaped to pay bills. The

cross examination that occurred explored the dishonesty associated with working while receiving disability checks and was proper impeachment evidence and not a violation of Ind. Evidence Rules 403 and 404(b).

[21] Rivera has not established that the challenged testimony resulted in a risk of unfair prejudice. Accordingly, the trial court did not commit fundamental error and reversal is not warranted.

## II.

[22] The next issue is whether Rivera's sentence is inappropriate in light of the nature of the offense and his character. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In reviewing a sentence, we give due consideration to the trial court's decision and its more direct knowledge of the offense and the offender. *Washington v. State*, 940 N.E.2d 1220, 1222 (Ind. App. Ct. 2011) (citing *Wilkes v. State*, 917 N.E.2d 675, 693 (Ind. 2009)), *trans. denied*. The burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[23] Rivera argues that a sentence above the advisory is inappropriate. He asserts that the offense is "much closer to the least serious offense," there was only a single incident, he was convicted of only attempted child molesting, he did not use substantial force, and that there was no physical harm. Appellant's Brief at

23. Regarding his character, he argues that he had no prior juvenile or criminal arrests, had a history of mental illness, and experienced a troubled childhood.

[24] Our review of the nature of the offense reveals that Rivera attempted to fondle or touch N.M., a child around the age of eight for whom he assumed a father-figure role and lived with at the time, with the intent to arouse or satisfy his own sexual desires. During her testimony, N.M. described Rivera's actions while other children were present and her efforts to stop him.

[25] Our review of the character of the offender reveals that, according to the presentence investigation report ("PSI"), Rivera was placed at Mt. Sinai Hospital at age twelve for approximately one month for mental health intervention and he stated he had previously been diagnosed with depression, anger management issues, and anxiety. It also indicates that he stopped taking prescribed medications, that he first used marijuana at age seventeen and quickly began using it daily, "a habit that continued through 1-8-18," that over time he has come to believe "marijuana is really the only substance of benefit," that he "went into great detail about how marijuana addresses his mental health and physical health needs," and that he "finds this substance to be the most appropriate response to any problem in his life." Appellant's Appendix Volume II at 80-81. Further, Rivera has not otherwise established any nexus linking his history of mental health issues or his childhood trauma to the instant offense. *See Washington*, 940 N.E.2d at 1223-1224 (finding no apparent nexus between the defendant's mental illness and the crime and holding thus that the mental illness bears little weight on analysis of his character).

After due consideration, we conclude that Rivera has not sustained his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

For the foregoing reasons, we affirm Rivera's conviction and sentence.

Affirmed.

May, J., and Mathias, J., concur.